**STATE TEACHERS RETIREMENT BOARD, Plaintiffs-Appellants,**

v.

**FLUOR CORPORATION and Manufacturers Hanover Trust Company, Defendants-Appellees.**

**No. 328, Docket 80-7592.**

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1981.

Decided May 26, 1981.

Rehearing Denied June 22, 1981.

Russell A. Kelm, Columbus, Ohio (Schwartz, Shapiro, Kelm & Warren, Columbus, Ohio, Nelson E. Genshaft, William J. Brown, Ohio Atty. Gen., James B. Farm-er, Asst. Atty. Gen., Columbus, Ohio, of counsel), for plaintiffs-appellants.

Raymond L. Falls, Jr., New York City (Cahill, Gordon & Reindel, New York City, John A. Shutkin, New York City, of counsel), for defendant-appellee Fluor Corporation.

Richard J. Concannon, New York City (Kelley, Drye & Warren, New York City, Robert E. Crotty, New York City, of counsel), for defendant-appellee Manufacturers Hanover Trust Company.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

State Teachers Retirement Board ("State Teachers"), a public pension retirement fund established by the State of Ohio, appeals from a judgment of dismissal by the District Court for the Southern District, Robert W. Sweet, J., of its class action on behalf of all those who sold stock of the Fluor Corporation ("Fluor") during the period March 3 to March 13, 1975, without the knowledge of certain information regarding a construction contract award to Fluor. It seeks damages from the defendant Fluor for alleged violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10b–5, caused by Fluor's failure to disclose this inside information. State Teachers further alleges that Fluor revealed this information to the defendant Manufacturers Hanover Trust Company ("Manufacturers"), who later purchased a large block of Fluor stock from State Teachers. It is also alleged that Fluor failed to halt trading in its stock despite increased market activity in the stock due to rumors about the contract.

Three years after instituting this class action, State Teachers sought leave to amend its complaint to include a claim against Fluor for tipping additional material inside information unrelated to the construction contract and additional claims based on statements made by Fluor's officers which misrepresented or omitted mate-

rial facts and on violations of the New York Stock Exchange Listing Agreement and Company Manual. State Teachers also sought leave to add J. Robert Fluor (chairman of the board and chief executive officer of Fluor Corporation) as a defendant. Defendants Fluor and Manufacturers opposed these amendments and moved for summary judgment.

The district court permitted State Teachers to amend its complaint only to include the claim for violation of the Exchange's rules and for the misrepresentations and omissions. Leave to amend the complaint to include the other claims and to add J. Robert Fluor as a defendant was denied. Judge Sweet then granted summary judgment for the defendants on the entire complaint. *See* 500 F.Supp. 278 (S.D.N.Y.1980).

Finding no evidence of *scienter* on the part of either defendant, we affirm the district court's grant of summary judgment for defendants on the section 10(b) claims which are based upon Fluor's failure to disclose inside information and to halt trading. For this same reason, we affirm the dismissal of the misrepresentation claim and the claim for violation of the Exchange's rules. We reverse, however, the dismissal of State Teachers' tipping claim against both defendants because there are material issues of fact. We also reverse the district court's refusal to permit the plaintiffs to amend their complaint to include an allegation that Fluor tipped to Manufacturers inside information unrelated to the construction contract. This refusal was an abuse of discretion under the standard announced in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Finally, we affirm the district court's denial of leave to add Mr. Fluor as a party defendant.

## I.

Fluor, a California corporation with its headquarters in Los Angeles, is a world-wide engineering and construction company. In September, 1974, Fluor was invited, along with two other large construction companies, to submit proposals on a $1 billion project to build a coal gasification plant in South Africa for the South African Coal, Oil and Gas Corporation Limited ("SASOL"). On February 25, 1975, SASOL informed Fluor that, subject to negotiating the terms of an agreement, Fluor would be awarded the project known as SASOL II. Three days later, Fluor signed an agreement with SASOL.

The agreement provided for an "embargo" on all publicity regarding the appointment of Fluor as contractor until March 10, 1975.[1] The ostensible purpose of this pledge of confidentiality was SASOL's need to complete delicate negotiations with the French government for financing prior to the contract's announcement. March 10 was also the date of Fluor's annual shareholders meeting.

On the morning of February 28, one of Fluor's representatives in South Africa telephoned David Tappan, vice-chairman of Fluor, in Los Angeles and notified him that the SASOL II contract was either signed or about to be signed. That morning, Walter Russler, Fluor's Director of Investor Relations, began preparation of a news statement to be released on March 10. On the morning of March 4, Russler and Paul Etter, Fluor's Public Relations Manager, received numerous inquiries from security analysts regarding rumors that Fluor had won a contract for a large project. Neither Russler nor Etter commented on these rumors. Etter then informed J. Robert Fluor of these rumors and suggested to him that a news release be issued "as soon as possible." Meanwhile, during the week starting March 3, the volume of trading in Fluor's stock increased over that of previous weeks and the price moved up slightly.

1. This provision in the contract stated:

SASOL has placed an embargo on all publicity with regard to the appointment of a SASOL II contractor and the negotiations as well as the status thereof shall be kept confidential by all persons involved therein up to 10 March 1975 unless the Company Secretary advises to the contrary. The other tenderers will be notified by SASOL that negotiations are in progress with one of the tenderers and that a contract will be awarded if the present negotiations are successful.

On March 5, the draft of the news release prepared by Russler was approved by J. Robert Fluor. The release was then cabled to Fluor's representatives in South Africa for approval by SASOL. That same day and again on the following day, David Geffner, a specialist in Fluor stock on the Pacific Coast Exchange, called to report rumors that Fluor had obtained a large contract in the Middle East and that there might be a tender offer for its stock. In addition, on March 5, an analyst at Merrill Lynch asked Russler whether Fluor had received the coal gasification contract in South Africa. A factual dispute exists over whether Russler denied that the contract had been awarded to Fluor or whether he avoided answering the question.

Russler also spoke with a reporter for Reuters on March 5. At 2:02 p. m. (EST) on March 5 or 6, a story was sent out on the Reuters financial wire that quoted a Fluor "spokesman" as saying that the increased market activity probably reflected the anticipation of the company's final quarter earnings report and might also be attributable to the fact that the company was "being considered for some major orders."

On March 6, the volume of Fluor stock surged three-fold and the price increased from 22–¼ to 25.[2] This stock activity caused Jonathan Veniar, a market analyst at the New York Stock Exchange, to call Richard Humbert at Fluor's legal department. Humbert told Veniar that he was uncertain of the reason for the increased volume, but he did indicate three possible explanations: (1) Fluor had been advised that an unknown group was interested in purchasing one million shares of the company's common stock; (2) Fluor had been awarded the as yet unannounced SASOL II contract, and (3) there were potential new jobs for Fluor in Iran and Saudi Arabia. Veniar told Humbert that the Exchange might exercise its prerogative to halt trading pending the announcement of the SASOL II contract. Humbert agreed that a suspension might be beneficial.

On March 7, the Stock Exchange halted trading on the stock pending an announcement to be made the following Monday, March 10. At 9:00 a. m. (EST) on March 10, Fluor issued a press release announcing the signing of the SASOL II contract. At 11:16 a. m. (EST) trading in Fluor stock was resumed.

Between March 3 and March 6, State Teachers, one of the largest public pension funds in the United States with assets of over $3 billion, sold 288,257 shares of Fluor stock held in its portfolio for about $6.4 billion.[3] This amounted to approximately 40 percent of the shares traded that week. State Teachers' decision to sell Fluor stock had been made in January 1975 and was based, at least in part, on the belief that the future market price for Fluor stock would not fully reflect the earnings from projects in foreign countries. During this same four day period, Manufacturers decided to purchase approximately 200,000 Fluor shares. Manufacturers already held more than 275,000 shares of Fluor stock in various accounts which it managed; also, Fluor was on Manufacturers' list of recommended stocks. From March 3 to March 13—the period which defines the class—Manufac-

**2.** *Daily Market Reports of Individual Stock Sales on the New York Stock Exchange*

| | March 3 | March 4 | March 5 | March 6 |
|---|---|---|---|---|
| Volume . . . . | 102,400 | 90,200 | 146,300 | 342,000 |
| High . . . . | 22-3/8 | 23 | 22-5/8 | 25-1/4 |
| Low . . . . . | 20-7/8 | 21-7/8 | 22 | 21-3/4 |
| Close . . . . | 21-7/8 | 21-7/8 | 22-1/4 | 25 |

**3.** State Teachers sold its holdings of Fluor stock on the following days:

| Date | Volume | Price |
|---|---|---|
| January 27, 1975 | 20,000 | 20 1/4 |
| January 28, 1975 | 10,000 | 20 5/8 |
| February 20, 1975 | 5,900 | 21 |
| March 3, 1975 | 8,900 | 22 |

| Date | Volume | Price |
|---|---|---|
| March 3, 1975 | 1,100 | 22 1/8 |
| March 4, 1975 | 6,800 | 22 3/4 |
| March 4, 1975 | 1,700 | 22 7/8 |
| March 4, 1975 | 1,500 | 23 |
| March 5, 1975 | 64,000 | 22 |
| March 5, 1975 | 2,300 | 22 1/8 |
| March 5, 1975 | 22,500 | 22 1/4 |
| March 5, 1975 | 15,500 | 22 3/8 |
| March 5, 1975 | 2,600 | 22 1/2 |
| March 6, 1975 | 3,900 | 22 |
| March 6, 1975 | 700 | 22 1/8 |
| March 6, 1975 | 156,700 | 22 1/4 |
| March 6, 1975 | 57 | 22 1/8 |
| | 324,157 | |

turers purchased a total of 292,000 shares of Fluor stock.

On February 24, 1975, Lester Winterfeldt, a security analyst with Manufacturers, traveled to Los Angeles to meet with representatives of several companies, including Fluor. He met with Etter and spoke briefly with J. Robert Fluor and David Tappan. Winterfeldt did not return to New York until March 3 and the day following his return, he discussed with Joel Tirchswell, as senior vice-president at Manufacturers, what he had learned on his trip. On March 4 and 5, Winterfeldt presented a report about his trip, including his contact with Fluor, to two regularly scheduled meetings of Manufacturers' investment officers. Afterwards, two groups of investment officers at Manufacturers decided to acquire a larger position in Fluor stock: about 200,000 more shares.

On March 5 or 6, Daniel Marciano, a trader for the brokerage firm of Mitchell Hutchins, Inc., telephoned a trader at Manufacturers to offer a block of approximately 150,000 shares of Fluor stock that had been put up for sale by State Teachers. Manufacturers bought the stock without knowing that the stock was being sold by State Teachers.

In its initial complaint dated May 12, 1976, State Teachers alleged that Fluor committed fraud by failing either to disclose news of the SASOL II contract or to halt trading in the stock. State Teachers asserted that this alternative duty arose when Fluor became aware of rumors in the marketplace. It further asserted that Fluor committed fraud by tipping information regarding the SASOL II agreement to Manufacturers before making a public announcement. In addition to seeking damages from Fluor, State Teachers sought damages from Manufacturers for trading with exclusive knowledge of the signing of this agreement.

More than three years after these allegations were made, the district court granted leave to State Teachers to amend the complaint to include a claim for violation of the New York Stock Exchange Listing Agreement and Company Manual based on Fluor's failure to notify the Exchange of the SASOL II contract despite the rampant rumors in the marketplace. The district court also permitted the addition of a claim for fraud based upon two incidents: first, Etter's alleged denial to a security analyst on March 5 that Fluor had received the SASOL II contract, and second, Russler's failure to tell the Reuters reporter about the contract. Both of these new claims, reasoned the district court, directly relate to Fluor's failure to disclose the SASOL II contract which was the target of the original complaint.

The district court refused to permit State Teachers to add the other section 10(b) claims against both Fluor and Manufacturers because they were unrelated to the SASOL II contract. These added claims alleged that Manufacturers violated section 10(b) by purchasing the block of Fluor shares with knowledge of material inside information concerning, *inter alia*, Fluor's financial condition, operations and backlog. Fluor allegedly tipped this information to Manufacturers. The district court would not permit these amendments because they were brought nearly three years after plaintiffs learned of the February 24 meeting between Manufacturers and Fluor and more than one year after plaintiffs completed depositions of Manufacturers' employees. Plaintiffs explained that the delay resulted from their efforts to verify the non-public nature of the information tipped. The district court found that this delay was unwarranted and reasoned further that the addition of these new claims would delay the trial date by raising new factual issues which would require more discovery, and possibly require a redefinition of the class.

In addition, the district court refused to permit State Teachers to add J. Robert Fluor as a party defendant on two claims: (1) failure either to disclose the SASOL II contract or to seek a suspension in trading of Fluor stock, and (2) breach of fiduciary duties owed to the plaintiffs as stockholders under state law. The district court found that under section 27 of the Securities Ex-

change Act of 1934, 15 U.S.C. § 78aa,[4] a federal securities law claim against Mr. Fluor could not be brought in the Southern District of New York. As Mr. Fluor's failure to disclose occurred "in only one place— where it should have been made," 500 F.Supp. at 290, the district court concluded that California, the location of Fluor's headquarters, would be the only situs of the alleged nondisclosure.

The district court then granted summary judgment for the defendants on State Teachers' five remaining federal securities law claims. As to the first claim that Fluor failed to disclose the existence of the SASOL II contract or to seek a halt in trading of Fluor stock in violation of section 10(b) and Rule 10b–5, the district court applied the rule that there is no liability for delay in the release of information where it is done in a good faith exercise of business judgment. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 850 n.12 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The court rejected the argument that the defendants did not act in good faith because they were reckless. It found that Fluor's delay in announcing the SASOL II contract was due to a good faith effort to comply with the terms of the contract. The district court also concluded that there was no valid claim under the New York Stock Exchange Listing Agreement and Company Manual due to the lack of evidence that Fluor intended to defraud investors.

The third claim under section 10(b), relating to Fluor's alleged misstatement and omission of material facts, was declared meritless for two reasons. First, there was no showing that State Teachers or any other stockholder relied on Fluor's statements to the security analyst at Merrill Lynch. Second, Russler's failure to tell the Reuters reporter that the SASOL II contract might explain the recent activity in Fluor stock did not exhibit an attempt to defraud investors.

The final two claims disposed of by the district court were that Fluor tipped material inside information regarding the SASOL II contract to Manufacturers and that Manufacturers thereafter traded in Fluor stock without disclosing this information. The district court granted defendants' motion for summary judgment on these claims because it found that the proof presented did not indicate that Manufacturers received any inside information; rather, the evidence showed that Manufacturers learned only that Fluor might be awarded the SASOL II contract, a fact known to other investors.[5]

State Teachers now appeals from the district court's denial of leave to amend the complaint and to add Mr. Fluor as a defendant. In addition, State Teachers appeals from the summary judgment dismissing each of the five federal securities law claims.

## II.

The issues presented are (i) whether Fluor may have breached a duty to disclose information regarding the SASOL II contract or to halt trading in the Fluor stock in violation of section 10(b); (ii) whether State Teachers has an implied federal right of action for violation of the New York Stock Exchange Listing Agreement and Company Manual based on Fluor's failure to notify the Exchange of the SASOL II contract

---

**4.** 15 U.S.C. § 78aa provides in part:

Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, ... may be brought in any such district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

**5.** Once the federal claims were disposed of, the district court dismissed plaintiffs' remaining state law claims under count six of the complaint finding no reason to exercise pendent jurisdiction. Count six alleged that Fluor and J. Robert Fluor breached their fiduciary duties to stockholders under state law.

despite rumors in the marketplace; (iii) whether Fluor may have made statements which misrepresented or omitted material facts in violation of Rule 10b–5; (iv) whether Fluor may have tipped inside information of the signing of the SASOL II contract to Manufacturers who in turn traded with knowledge of this inside information; (v) whether the district court abused its discretion in not permitting State Teachers to amend its complaint to include a claim against Fluor for tipping additional inside information unrelated to the SASOL II contract and against Manufacturers for trading with knowledge of this information, and (vi) whether the district court abused its discretion in not permitting State Teachers to add J. Robert Fluor as a party defendant.

### 1. *Duty to Disclose or Halt Trading*

 State Teachers asserts that Fluor had a duty to disclose the signing of the SASOL II contract during the week of March 3 when rumors became rampant and the price and volume of its stock shot upward. We disagree. Under all the circumstances, and particularly in light of its agreement with SASOL to make no announcement until March 10, Fluor was under no obligation to disclose the contract. A company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156 (2d Cir. 1980); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969). There is no evidence that the rumors affecting the volume and price of Fluor stock can be attributed to Fluor. Fluor responded to inquiries from analysts between March 4 and March 6 without comment on the veracity of the rumors and without making any material misrepresentation.[6]

 Moreover, even if the facts here give rise to a duty to disclose, there is no showing of any intent to defraud investors or

any conduct which was reckless in any degree. Fluor's actions between March 3 and March 6 were made in a good faith effort to comply with the publicity embargo. The record completely lacks any evidence of *scienter*—a prerequisite to liability under section 10(b). *Ernst & Ernst v. Hochfelder, supra.* Indeed, at oral argument, counsel for State Teachers conceded that Fluor may not have had a duty to disclose the SASOL II contract under the circumstances.

State Teachers argues that, in any event, Fluor was under a duty to do what it could to halt trading in its stock once it learned that rumors regarding the SASOL II contract were affecting the price of the stock. This issue was not specifically addressed by the district court. State Teachers now argues that once an issuer decides as a matter of business judgment to withhold material information, it then assumes a duty to protect that news from selective disclosure which may disrupt the public market in its stock. In such a circumstance, the issuer must notify the Exchange and request a trading suspension until the news may be made public. State Teachers argues that this duty arises where, as here, the issuer becomes aware that the precise details of the material information are circulating in the market. It submits that this duty (i) is assumed by any issuer who has its stock traded on a public stock exchange and (ii) is consonant with the purpose of the Securities Exchange Act of 1934 to insure the integrity of the marketplace.

Relying on our decisions in *IIT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980) and *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), State Teachers further argues that an issuer who fails to fulfill this duty to request a halt in trading, knowing that a selling stockholder may suffer a loss, is reckless; therefore, the *scienter* requirement for liability to attach in a section 10(b) private action is satisfied.

---

**6.** State Teachers' claim that Fluor made material misrepresentations is discussed more fully later in this opinion. *See* 851, *infra*.

■ Under the circumstances presented in this case, we find that Fluor had no duty under section 10(b) to notify the Exchange and request that trading in its shares be suspended. Fluor first heard of rumors in the marketplace regarding the SASOL II contract on March 4. At that point, the volume of trading in Fluor stock had increased over previous weeks but there was no significant change in price. It was not until March 6 that the volume of trading in the stock and its price increased dramatically. The record indicates that no one at Fluor knew the reason for these market developments. That day, Fluor told the New York Stock Exchange that the signing of the SASOL II contract might be an explanation for the activity, and it agreed to the suggestion of the Exchange that trading be suspended. There was no trading on March 7. These facts obviate any suggestion that Fluor acted recklessly, much less with the fraudulent intent necessary for liability under section 10(b). *See, e. g., Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *Ernst & Ernst v. Hochfelder, supra.* Fluor acted scrupulously when it revealed to the Exchange that the signing of the SASOL II contract might be an explanation for what the Exchange perceived as unusual market activity in Fluor stock. Fluor's good faith is further evidenced by its endorsement of the Exchange's decision to halt trading. For us to say that Fluor should have noti-fied the Exchange at some earlier time would be to create a standard of liability under section 10(b) which gives undue weight to hindsight.

In addition to the absence of an intent to defraud investors, the difficulty of establishing causation also supports our conclusion that a section 10(b) claim does not exist here for Fluor's failure to request a halt in trading. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Although the Exchange likely would have honored a request by Fluor to halt trading, the decision rests entirely in the hands of the Exchange. It would be impossible for State Teachers to show on the record before us that had Fluor acted sooner to request a halt in trading the Exchange would have suspended trading before March 7.[7]

## 2. Private Action for Violation of NYSE Listing Agreement and Company Manual

State Teachers argues that Fluor's failure to comply with section A2 of the New York Stock Exchange's Company Manual creates a federal claim.[8] Section A2 of the Company Manual states that a corporation should be prepared to make an immediate announcement of important corporate developments if unusual market activity occurs prior to its announcement. The Manual specifically leaves to management's judg-

---

**7.** Where unusual market activity is the result of rumors, the most effective way to protect the integrity of the market is for the company to disclose information sufficient to dispel these rumors. Our decisions mentioned in this opinion have articulated when a duty to disclose arises under section 10(b). We do not believe an alternative duty to notify the Exchange or request a halt in trading should be imposed in this case. The facts which existed prior to March 7 did not give Fluor reason to believe that stockholders would be better protected if trading was halted than if it were not. Moreover, the Exchange itself has not imposed any specific duty to report rumors or to request a halt in trading. The Company Manual "recommends that its listed companies contact their Liaison Representatives if they become aware of rumors circulating about the company." Company Manual at A23. Also, the Manual recommends that a company notify the Exchange of any news at least ten minutes before it is announced. "If the Exchange receives such notification in time, it will be in a position to consider whether, in the opinion of the Exchange, trading in the security should be halted temporarily." *Id.* By telling the Exchange about the SASOL contract four days before its announcement, Fluor met its obligation under the Exchange's rules.

**8.** State Teachers also claims Fluor violated its Listing Agreement with the Exchange. The only portion of the Listing Agreement relevant to this case states that "[t]he Corporation will promptly notify the Exchange of any change in the general character or nature of its business." The SASOL project, however, did not involve a change in the general character or nature of Fluor's business.

ment, however, the timing of a public release. The Manual further states that "[i]f rumors or unusual market activity indicate that information on impending developments has leaked out, a frank and explicit announcement is clearly required." NYSE Company Manual at A23. And, if rumors "are correct, . . . an immediate, candid statement to the public as to the state of negotiations or the state of development of corporate plans . . . must be made directly and openly." *Id.*

The district court concluded that these Exchange rules did not give rise to an implied federal right of action. "A review of the rule in the context of the entire regulatory scheme," stated the court, "reveals that Congress and the SEC have already regulated the corporation's disclosure requirements and that section A2 cannot be viewed as a stock exchange 'rule which provides what amounts to a substitution for regulation by the SEC itself.'" 500 F.Supp. at 296, *quoting Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966).

■ State Teachers argues that the district court failed to follow our decision in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), which held that the Exchange's Listing Agreement and Company Manual could provide a private right of action against issuers of securities. To the contrary, the district court did not foreclose the possibility that a private right of action existed under the Listing Agreement and Company Manual, but instead ruled that the relevant portions of the Agreement and the Manual did not provide

the basis for a private remedy in this case.[9] We agree with the district court. In *Van Gemert v. Boeing Co., supra*, the defendant Boeing failed to comply with the notice requirements of the Exchange which specifically apply to redemptions.[10] Following our decision in *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), we reversed the district court's determination that the Exchange's rules cannot, under any circumstances, give rise to civil liability under federal law and concluded that a federal claim for breach of these requirements was "colorable."

This ruling was based on two considerations. First, the notice requirements of the Exchange served an important function in the convertible securities market of protecting investors, particularly a large number of individual investors. We expressed concern that inadequate notice of a redemption call to debenture holders may render valueless the investor's interest.[11] Second, under this court's analysis in *Colonial Realty*, nothing in the legislative history of the Securities Exchange Act of 1934 precluded the private enforcement of these rules in federal court.

In the case at bar, we are faced with a corporation's obligations under section A2 of the Exchange's Company Manual to disclose general corporate news. This obligation is broader than the specific notice requirements involved in *Van Gemert*. Moreover, unlike the rules in *Van Gemert*, section A2 of the Exchange's Company Manual touches upon areas of corporate activity already extensively regulated by Congress and the Securities and Exchange Commis-

9. The court did cast doubt on the possibility that failure to comply with the Company Manual could ever lead to a federal action because of the disclaimer contained in the Manual's introduction. 500 F.Supp. at 296 n.13. Because of our ruling today, however, we need not reach this question.

10. The cited rules were Section A10 of NYSE Company Manual and Part III, paragraph 4, of the NYSE Listing Agreement. *See* 520 F.2d at 1376.

11. In *Van Gemert* we observed,

The debenture holding relies on the opportunity to make a proper conversion on due notice. Any loss occurring to him from failure to convert . . . is not from a risk inherent in his investment but rather from unsatisfactory notification procedures. The debenture holder's expectancy is that he will receive reasonable notice and it is his reliance on this expectancy that the courts will protect.
520 F.2d at 1385 (citations omitted).

sion.[12] Thus, a legislative intent to permit a federal claim for violation of the Exchange's Company Manual rules regarding disclosure of corporate news cannot be inferred. In any case, although the debate in this circuit over whether a rule of the Exchange can provide the basis for an implied private right of action is far from over, compare *Leist v. Simplot*, 638 F.2d 283, 296 n.11 (1980) (Friendly, J.), *with id.* at 337 n.8 (Mansfield, J., dissenting), we note that the persuasiveness of *Van Gemert* as a precedent in this area may be subject to question on the ground that it was handed down without benefit of the Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which established criteria for implying a private right of action.

### 3. *Misrepresentation and Omission*

State Teachers' third claim alleges that Fluor violated Rule 10b–5 on two separate occasions. Specifically, State Teachers alleges that on March 5 Walter Russler, Fluor's Director of Investor Relations, in response to an inquiry from a security analyst, Alexander Blanton, falsely denied a rumor that Fluor had received the SASOL project. On the same day, Russler responded to a question from a reporter for Reuters by saying that a possible explanation for the recent activity in Fluor stock was that Fluor was "going to announce earnings soon" and there had "been some rumors about big projects floating around." Reuters later reported that a company spokesman said "the company is 'being considered for some major orders.'" It is alleged that this was a misleading omission of a material fact because Russler knew on that day that Fluor had received the billion dollar SASOL contract.

As to the misrepresentation claim, the district court found no evidence of reliance. In his uncontroverted deposition testimony, Blanton states that he did not mention his conversation with Russler to anyone until

after the March 7 suspension of trading in Fluor stock. Since the plaintiff pointed "to no other evidence, direct or circumstantial, from which an opposite conclusion may be drawn," 500 F.Supp. at 298, the court found no factual issues regarding State Teachers' lack of reliance on the misstatement.

■ We conclude that the district court properly granted summary judgment as to this claim. Reliance is an essential element of a 10b–5 claim based upon an affirmative misrepresentation. See *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33 (2d Cir. 1976); *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975). In light of Blanton's testimony and the absence of supporting facts in opposition, summary judgment was appropriately granted. See *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

As to the omission claim, the district court treated this as a restatement of State Teachers' claim that Fluor failed to disclose material information. The court acknowledged that there is a distinction between a company's right "to maintain . . . a secret when no statements are issued, and the affirmative obligations that attach under Rule 10b–5 when a corporation makes any sort of statement." 500 F.Supp. at 299. "Nevertheless," the court concluded, "it is simply not realistic to say that a corporation may determine when it will release information and then hold it liable when its representatives make comments—as they inevitably will in the normal course of business—that do not mention this information." *Id.* The district court dismissed this claim again because evidence of an intent to defraud investors was totally lacking.

■ We agree that there is no evidence on the record before us that Russler or any other Fluor officer acted with *scienter*. Thus, it is immaterial whether or not Russler's statement to Reuters omitted any references to the signing of the SASOL contract.

---

**12.** *See, e. g.*, sections 10(b), 13 and 14 of the Securities Exchange Act of 1934, and rules promulgated thereunder.

#### 4. Tipping News of SASOL Contract

State Teachers' complaint further asserts that Manufacturers traded with knowledge of material inside information regarding the SASOL contract. This claim alleges that on February 24 Fluor representatives told Winterfeldt, a security analyst at Manufacturers, that the SASOL agreement with Fluor was imminent and, further, that on March 4 and March 5 Winterfeldt met with two investment groups at Manufacturers who thereafter purchased large amounts of Fluor stock. As proof of its claim, State Teachers offered Winterfeldt's notes from the February 24 meeting which indicate that he was told that a $2 billion coal gasification project "could go" in South Africa in 1975. Part of his notes entitled "possible work" contains the entry "South Africa—2.0 billion coal gasification."

The district court afforded State Teachers every inference from the proof presented. The court ruled that even assuming that Fluor told Winterfeldt that a $2 billion coal gasification project "could go" in South Africa that year, no Rule 10b–5 violation occurred because this was not material inside information. The very most Winterfeldt could have learned on February 24 from Fluor regarding the SASOL project was that Fluor representatives were optimistic about the possibility of getting the contract. It was not until February 25 that Fluor learned from SASOL that they were the preferred contractor for the project. The court found evidence of existing "public knowledge that SASOL II was in the planning stages, that Fluor was one of the few companies that could handle the SASOL II project . . . and that Fluor had been the contractor for [a previous SASOL project.]" 500 F.Supp. at 300. Failing to find any facts proffered by the plaintiffs to refute this evidence, the court concluded there was no issue of fact over whether the investing public knew that Fluor might get the SASOL II project. We disagree.

This is not the first time we have had occasion to address problems arising from corporate officers' dealings with financial analysts. See, e. g., Elkind v. Liggett & Myers, Inc., 635 F.2d 156 (2d Cir. 1980); SEC v. Bausch & Lomb, Inc., 565 F.2d 8 (2d Cir. 1977). Our observations in Elkind apply to the situation at bar.

A skilled analyst with knowledge of the company and the industry may piece seemingly inconsequential data together with public information into a mosaic which reveals material non-public information. Whenever managers and analysts meet elsewhere than in public, there is a risk that the analysts will emerge with knowledge of material information which is not publicly available.

Elkind v. Liggett & Myers, Inc., 635 F.2d at 165.

■ We believe the plaintiffs have presented sufficient evidence to raise an issue of fact over the non-public nature of the information given Winterfeldt. In his deposition, Etter, the Fluor Director of Investor Relations, states that the fact that Fluor was under consideration for the SASOL project was not public information. This testimony contravenes the conclusion that SASOL's consideration of Fluor for the project could be easily gleaned from publicly available information.

In addition to the revelation of non-public information about a company to someone who then trades in the company's stock, tipping liability requires that the tipped information be material and that the tipper-defendant act with scienter. Elkind v. Liggett & Myers, Inc., 635 F.2d at 166. Central to the issue of materiality is "whether the tipped information, if divulged to the public, would have been likely to affect the decision of potential buyers and sellers." Id. Here, it is likely that even the fact that Fluor was bidding on a billion dollar project like SASOL would be significant information for the reasonable investor. Fluor's practice of not announcing the projects on which it has bid underscores the importance of such information.

The scienter requirement presents a more difficult question in this case. In Elkind, we held that "[o]ne who deliberately tips information which he knows to be material and non-public to an outsider who may rea-

sonably be expected to use it to his advantage has the requisite scienter." 635 F.2d at 167 (footnotes omitted). In the case at bar, there is evidence to suggest that Etter knew at the meeting with Winterfeldt that information about the possibility of Fluor receiving the SASOL contract was non-public and material. We believe this raises a factual question as to whether Fluor acted with *scienter.*

Tipping liability against the tippee Manufacturers also requires a showing of *scienter.* This would require evidence that Manufacturers knowingly received inside information and used it to its advantage without disclosing it to the public. State Teachers points to the fact that Winterfeldt entered the February 24 meeting with a written summary of available public information and left the meeting with several added notations regarding the SASOL project. Manufacturers asserts, however, that Winterfeldt did not discuss with anyone else at Manufacturers anything about Fluor stock until eight days after the meeting; also, Winterfeldt spent a full day in his office on his return from California before routinely reporting on his trip to Manufacturers' investment officers. Had Winterfeldt known that he had received inside information he presumably would have notified the officers at Manufacturers much sooner. The fact remains, however, that these same investment officers purchased a block of Fluor shares the day after the meeting with Winterfeldt. This raises material questions of facts regarding Manufacturers' *scienter.*

5. *State Teachers' Motion to Add Claims Unrelated to the SASOL Contract*

Four months after learning from Etter's deposition that certain facts disclosed on February 24, 1975 were not public, State Teachers sought leave to add claims against Fluor and Manufacturers for tipping additional information unrelated to the SASOL project. The district court denied leave to amend on the ground that it would unduly delay the trial so as to prejudice the defendants. The court also denied leave to add J. Robert Fluor as a defendant.

The district court properly denied the addition of J. Robert Fluor as a defendant, but for reasons other than those stated. Without deciding whether the Southern District of New York is the proper district in which to bring a federal securities law action against Mr. Fluor, we find that the proposed claim is without merit. The gravamen of plaintiffs' added claim states that Mr. Fluor violated section 10(b) and Rule 10b–5 by failing to take steps either to disclose the SASOL agreement or to stop trading in Fluor's common stock. We have already discussed the lack of any duty to disclose and the complete lack of evidence of *scienter* on the part of Fluor. This same analysis applies to the failure-to-disclose claim against Mr. Fluor.

Plaintiffs also assert that Mr. Fluor should have requested that the New York Stock Exchange halt trading on the theory that the Exchange would suspend trading at the request of an issuer. As previously stated, we do not believe a section 10(b) violation occurred here by reason of Fluor's failure to request that the Exchange halt trading in Fluor stock.[13]

The remaining issue before us is whether the district court's denial of leave to amend the complaint to include tipping of additional inside information was an abuse of discretion. The alleged tipped information (relating, *inter alia,* to the increase in Fluor's backlog, projections of increases in Fluor's earnings per share, and the likelihood of Fluor obtaining projects other than SASOL II) appears to be material. The fact that soon after the information was tipped Manufacturers almost doubled its holdings of Fluor stock underscores the materiality of this information.

Fluor's duty in this situation was either to disclose the information to the public or not to disclose to anyone who might reasonably be expected to use it for trading purposes. It is possible that Fluor knowingly breached the latter duty. This type of tipping impairs the integrity of the market by

13. *See* 850, *infra.*

permitting the tippee to profit at the expense of investors who are disadvantaged by lack of inside information. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d at 169.

Rule 15(a) Fed.R.Civ.P. provides that leave to amend "shall be freely given." Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1963). Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend. *Howey v. United States*, 481 F.2d 1187, 1190–91 (9th Cir. 1973); *Middle Atlantic Utilities Co. v. S.M.W. Development Co.*, 392 F.2d 380, 384 (2d Cir. 1968).

▉ Although State Teachers' amendment may result in a delay, it will not unduly prejudice the defendant. The amended claim was obviously one of the objects of discovery and related closely to the original claim of non-disclosure of the SASOL project. The delay in order to depose Etter was justified in light of State Teachers' need to verify what information was made public by Fluor. Clearly, this involved information better known to the defendants than to the plaintiffs.

This is not a case where the amendment came on the eve of trial and would result in new problems of proof. *See, e. g., Bradick v. Israel*, 377 F.2d 262 (2d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 101, 19 L.Ed.2d 124 (1967). At the time plaintiffs requested leave to amend, no trial date had been set by the court and no motion for summary judgment had yet been filed by the defendants. Also, it appears that the amendment will not involve a great deal of additional discovery. The participants in the February 24 meeting have already been deposed. Moreover, defendants' assertion that further delay would result from the necessity to redefine the class is unavailing. Plain-

tiffs presently represent all former stockholders who sold their stock between March 3 and March 13, 1975, without knowledge of Fluor's contract with SASOL. It is not likely that altering the class to include those who sold in this period without knowledge of any of the inside information in question will result in serious difficulty.[14] We conclude that the district court abused its discretion in denying leave to amend.

The order of the district court dismissing counts one, two and three is affirmed. The dismissal of counts four and five is reversed. The order denying leave to amend the complaint is affirmed as to the addition of J. Robert Fluor as defendant and reversed as to the addition of a tipping claim against the defendants. Furthermore, the dismissal of the state law claims on grounds of lack of pendent jurisdiction is reversed in light of our decision.

Affirmed in part; reversed in part; remanded for further proceedings consistent with this opinion.

---

14. Whether the class period should be limited to those who traded from March 3 to 13 is, of course, a matter for further consideration by the district court in light of the evidence which is adduced.