889 F.2d 1248
 15 Fed.R.Serv.3d 972
 The UNITED STATES of America, representing the Secretary of
Transportation, for and on Behalf of the MARITIME
ADMINISTRATION, and representing At-Sea
Incineration, Inc., Appellant,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF
CHICAGO (individually and as agent for The Bank of
California, N.A. and Canadian Imperial Bank of Commerce),
the Bank of California, N.A., and Canadian Imperial Bank of
Commerce, Appellees.
 No. 1047, Docket 89-5004.
 United States Court of Appeals,
Second Circuit.
 Argued April 19, 1989.
Decided Nov. 16, 1989.
 
 Jeremy R. Paul, Atty., Civ. Div., U.S. Dept. of Justice, Washington, D.C. (John R. Bolton, Asst. Atty. Gen., Leonard Schaitman, Atty., Civ. Div., Dept. of Justice, Washington, D.C., Benito Romano, U.S. Atty. for S.D.N.Y., New York City, of counsel), for appellant.
 Matthew Gluck, New York City (Herbert P. Minkel, Jr., Brent A. Friedman, Fried, Frank, Harris, Shriver and Jacobson, New York City, of counsel), for appellees.
 Before LUMBARD, ALTIMARI and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 This adversary proceeding was commenced in the United States Bankruptcy Court for the Southern District of New York on November 1, 1985, shortly after Tacoma Boatbuilding Company ("Tacoma"), a Washington based manufacturer of high technology, high performance vessels, filed in the same court a petition for reorganization under chapter 11 of title 11 of the United States Code. In connection with approximately $32 million in loans which they have made to Tacoma, appellees Continental Illinois Bank and Trust Company of Chicago ("Continental"), The Bank of California, N.A. and Canadian Imperial Bank of Commerce (collectively the "Banks") are parties to a security agreement with Tacoma granting them a security interest in Tacoma's inventory, receivables, contract rights, general intangibles and related assets. The Banks initiated the adversary proceeding seeking, inter alia, a declaration that their liens in the Apollo One and Apollo Two (collectively the "Vessels"), two ocean-going vessels to be used for at-sea incineration of toxic wastes which had been partially constructed by Tacoma, were "supreme and paramount to any liens [in the Vessels] claimed by" At-Sea Incineration, Inc. ("ASI") and the Maritime Administration,[1] and to the ownership interest therein claimed by Tacoma.
 
 
 2
 The Vessels were initially to be sold to the Apollo Company, L.P. ("Apollo"), to whose interest ASI succeeded, and the construction contracts granted Apollo a security interest in the Vessels. The contracts were contingent upon Apollo's obtaining a conditional commitment from MarAd to execute guarantees under Title XI of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A.App. Secs. 1271-1280 (West 1975 & Supp.1989), with respect to the Vessels. The commitment was obtained, and MarAd guaranteed bonds issued by Apollo to finance the construction of the Vessels. MarAd was subsequently compelled to fulfill the guarantee upon default, and succeeded to Apollo's (and ASI's) security interest in the Vessels.
 
 
 3
 MarAd answered the complaint on its own behalf and on behalf of ASI. MarAd generally denied the allegations of the Banks' complaint, but "admit[ted] that the Construction contracts name [Apollo] as the purchaser [of the Vessels]" and that "ASI is now the purchaser under the Construction Contracts." In its answer, however, Tacoma asserted as affirmative defenses that (1) the sale of the Vessels was effected in the ordinary course of Tacoma's business and was authorized by the Bank's security agreement, with the result that the Banks had lost their security interest in the Vessels pursuant to section 9-306 of the Uniform Commercial Code;[2] and (2) ASI was a buyer in the ordinary course of business under section 9-307 of the Uniform Commercial Code whose purchase of the Vessels was not subject to the Banks' security interest.
 
 
 4
 In subsequent motion papers filed in the Tacoma bankruptcy proceedings, MarAd contended that as successor in interest to ASI, MarAd was a buyer in the ordinary course of business of the Vessels and took free of the Banks' security interest. When the parties subsequently moved for summary judgment in the adversary proceeding, however, MarAd sought, but was denied, leave to amend its answer to assert as an affirmative defense its alleged status as a buyer in the ordinary course of business. The bankruptcy court ruled that the proposed amendment was dilatory and prejudicial. Summary judgment was then granted to the Banks because their security interest was prior in time to the security interest to which MarAd had succeeded.
 
 
 5
 We reverse and remand with the instruction to the district court to remand to the bankruptcy court with the instruction to allow MarAd to amend its answer to assert the "buyer in the ordinary course of business" defense.
 
 Background
 
 6
 A. The Transactions.
 
 
 7
 In September, 1980, the Banks and Tacoma entered into a security agreement, in connection with a loan of approximately six million dollars to Tacoma, whereby the Banks received a security interest in Tacoma's inventory, receivables, contract rights, general intangibles and related assets. The agreement contained the following provision:
 
 
 8
 Until such time as the [Banks] shall notify [Tacoma] of the revocation of such power and authority, [Tacoma] (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by [Tacoma] for such purpose, and use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by [Tacoma] for such purpose....
 
 
 9
 The Banks' security interest was perfected by the filing of a UCC-1 financing statement with the Washington State Department of Licensing (the "Department"), and a continuation statement was subsequently so filed. The loan agreements were later amended to allow for enhanced financing that eventually totalled over thirty-two million dollars.
 
 
 10
 On December 29, 1981, Tacoma contracted with Apollo to construct the Vessels and sell them to Apollo for $31,630,000 each. The contracts for the construction of the Vessels (the "Construction Contracts") provided that Tacoma was to retain title to the Vessels during construction, but that Apollo was granted a security interest in the Vessels and related materials (and contracts therefor) in order to secure performance. The security interest was perfected by the filing of a UCC-1 financing statement with the Department on October 20, 1982.
 
 
 11
 In October, 1982, Apollo issued ship financing bonds in the aggregate amount of $59,875,000 to raise a portion of the Vessels' construction costs. Simultaneously, Apollo entered into an authorization agreement and guarantee commitment with MarAd by which MarAd guaranteed payment of the bonds. As security for the guarantee, Apollo issued MarAd a promissory note in the amount of $59,875,000 and entered into a security agreement granting MarAd a security interest in Apollo's interest in the Vessels and Construction Contracts. On October 20, 1982, Apollo filed a UCC-3 statement with the Department to perfect the assignment. In January, 1985, Apollo assigned the Construction Contracts to ASI, seventy percent of whose common stock is owned by Tacoma and thirty percent by Apollo. The assignment provided that ASI's rights in the Construction Contracts were subject to MarAd's security interest.
 
 
 12
 On September 19, 1985, the Banks, in accordance with their loan agreement and security agreement with Tacoma, revoked Tacoma's authority to sell any of its property, including the Vessels. On September 23, 1985, Tacoma filed a petition for reorganization pursuant to chapter 11 of title 11 of the United States Code. At approximately that time, Tacoma ceased work on construction of the Vessels. Apollo One was then approximately ninety-five percent complete, and Apollo Two was approximately seventy percent complete. The bonds then went into default, and MarAd was required to pay the indenture trustee $59,390,000 in principal and $4,389,891.67 in accrued interest pursuant to its guarantee. In accordance with the terms of MarAd's security agreement with ASI, MarAd then foreclosed on ASI's right, title and interest in the Vessels and the Construction Contracts.
 
 
 13
 B. Legal Proceedings.
 
 
 14
 On November 1, 1985, the Banks commenced this action by filing a complaint seeking, inter alia, a declaration that their liens in the Vessels were superior to any liens therein claimed by ASI and MarAd, and to the ownership interest claimed by Tacoma. In its answer on behalf of itself and ASI, as previously noted, MarAd referred to Apollo, and subsequently ASI, as the "purchaser" under the Construction Contracts. The only separate defenses pleaded by MarAd, however, were that the Banks' complaint failed to state a claim for which relief could be granted, and that the bankruptcy court lacked jurisdiction of the subject matter. As also noted above, Tacoma filed an answer alleging affirmative defenses under sections 9-306 and 9-307 of the Uniform Commercial Code, including the defense that ASI was a buyer of the Vessels in the ordinary course of business.
 
 
 15
 On September 29, 1986, Tacoma filed a motion in its bankruptcy proceeding to reject the Apollo contracts, pursuant to 11 U.S.C.A. Sec. 365 (West 1979 & Supp.1989), on the grounds that the contracts were burdensome and that continued performance would cause financial loss and harm creditors. MarAd did not oppose the motion. In November, 1986, the bankruptcy court authorized the rejection of the Apollo contracts.
 
 
 16
 On October 31, 1986, Tacoma filed a motion in its bankruptcy proceeding seeking approval of a letter agreement with the Banks providing, inter alia, for a joint venture to complete and operate the Vessels in the event the Banks were determined to have a first lien on the Vessels. In opposing this motion, MarAd raised for the first time, in opposition papers filed November 20, 1986, its asserted status as a successor to a buyer of the Vessels in the ordinary course of business. The issue was raised as follows:
 
 
 17
 With respect to the Apollo vessels, Continental and [Tacoma] ignore At-Sea Incinerator's (ASI), now MARAD's, superior interests in these vessels. MARAD is a buyer in the ordinary course of business of the Apollo vessels, having spent over $59 million and thus takes free of any security interest created by [Tacoma]. Hence, Continental and [Tacoma] should not be permitted to make a court-sanctioned disposition of MARAD's property, albeit tentative.
 
 
 18
 In January, 1987, MarAd initiated some discovery. In February, 1987, the Banks moved for summary judgment, seeking a determination that the Banks' lien on Tacoma's inventory and other assets was superior to the liens of ASI and MarAd in the Vessels. On March 10, 1987, MarAd moved to adjourn the hearing on the Banks' summary judgment motion pending completion of discovery. On March 19, 1987, that motion was denied, but MarAd was given additional time to respond to the Banks' motion for summary judgment.
 
 
 19
 MarAd then responded to the Banks' motion and cross-moved for summary judgment, contending, inter alia, that the Banks' security interest did not cover the Vessels because Tacoma had sold them to Apollo, and thus ASI, in the ordinary course of business. On April 3, 1987, the Banks responded that "buyer in the ordinary course" is an affirmative defense that was waived, pursuant to Fed.R.Civ.P. 8(c),[3] since it was not raised in the answer, and could not be raised for the first time by a motion for summary judgment. The Banks also argued that the prior bankruptcy court order rejecting the Construction Contracts precluded the defense. Finally, the Banks contended that even if the defense were allowed, discovery and factual determinations would be required with respect to it, precluding summary judgment on the issue.
 
 
 20
 Three days later, MarAd filed a motion to amend its answer to include its claim to status as a buyer in the ordinary course of business, although contending in the alternative (1) that its original answer adequately raised the defense since it was not an affirmative defense required by Fed.R.Civ.P. 8(c) to be pleaded in MarAd's answer, and (2) that MarAd had in any event given notice of the defense in its opposition to the letter agreement between Tacoma and the Banks whose approval was sought in the Tacoma bankruptcy proceeding the previous fall.
 
 
 21
 In a decision and order dated December 31, 1987, the bankruptcy court held that "buyer in the ordinary course" was an affirmative defense that had to be raised in the defendant's answer, and had been waived. The court determined that MarAd had engaged in dilatory litigation tactics and denied MarAd leave to amend its answer, ruling that the Banks would be prejudiced by the delay because of the likely commencement of discovery and alteration of the previously defined theories of relief. The court granted the Banks' motion for summary judgment, declaring that the Banks possessed a "first in time" perfected security interest in the Vessels which primed MarAd's security interest, and denied MarAd's cross-motion for summary judgment.
 
 
 22
 On November 2, 1988, the district court affirmed the bankruptcy court order "on the reasoning of the court below." The Vessels have since been sold at auction, and the $7,200,000 proceeds are now held in escrow by Tacoma's counsel. MarAd filed a timely appeal from the ruling of the district court.
 
 Discussion
 
 23
 Two questions are presented by this appeal. We first consider whether MarAd's "buyer in the ordinary course of business" defense is an affirmative defense required by Fed.R.Civ.P. 8(c) to be pleaded in MarAd's answer. Answering this question in the affirmative, we next consider, and also answer in the affirmative, the question whether the district court and the bankruptcy court abused their discretion by denying MarAd leave to amend its answer to plead the defense.
 
 
 24
 A. Status of the "Buyer in the Ordinary Course of Business" Defense.
 
 
 25
 Fed.R.Civ.P. 8(c) provides that affirmative defenses shall be set forth in the answer to the complaint. "Failure to plead an affirmative defense in the answer results in 'the waiver of that defense and its exclusion from the case.' " Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir.1984) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1278, at 339 (1969)).[4] Although "buyer in the ordinary course of business" is not one of the defenses specified in Rule 8(c), the rule by its terms is not limited to the enumerated defenses, but applies to "any other matter constituting an avoidance or affirmative defense." Fed.R.Civ.P. 8(c).
 
 
 26
 The burden of proving "buyer" status rests with the party claiming it. See In re Gary Aircraft Corp., 681 F.2d 365, 373 (5th Cir.1982), cert. denied, 462 U.S. 1131, 103 S.Ct. 3110, 77 L.Ed.2d 1366 (1983); In re Air Vermont, Inc., 44 B.R. 433, 437 (D.Vt.1984). It would therefore appear appropriate that a defendant invoking that status plead it as an affirmative defense, since the absence of "buyer" status is not an element which the plaintiff must establish to make out a prima facie showing of liability. Cf. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.").
 
 
 27
 MarAd contends that whatever the ordinarily applicable rule, the facts of this case are distinguishable because the security agreement between the Banks and Tacoma specifically authorized Tacoma to "sell, lease or furnish under contracts of service any of the Inventory held by [Tacoma] for such purpose." MarAd argues that because of this provision, the absence of "buyer" status is an element of the Banks' case which they must affirmatively plead and prove.
 
 
 28
 MarAd cites no authority in support of this position, and we are loath to establish an exception premised upon language which is probably common to security agreements of this type. The facts concerning a purchaser's status, furthermore, are in most cases more easily accessible to the purchaser, a consideration which favors a requirement that "buyer" status be pleaded as an affirmative defense. See Gomez v. Toledo, 446 U.S. at 640-41, 100 S.Ct. at 1923-24.
 
 
 29
 We conclude that "buyer in the ordinary course of business" is an affirmative defense, and that Fed.R.Civ.P. 8(c) therefore imposed upon MarAd the burden of pleading it. This brings us to the question whether MarAd's motion to amend its answer to do so was properly denied.
 
 
 30
 B. Leave to Amend.
 
 
 31
 Fed.R.Civ.P. 15(a) provides that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The leading case concerning this provision, Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), explained its purpose and application in these terms:
 
 
 32
 Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. See generally, 3 Moore, Federal Practice (2d ed. 1948), paragraphs 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.
 
 
 33
 Id. at 182, 83 S.Ct. at 230.
 
 
 34
 As Foman makes clear, the denial of leave to amend a pleading may be overturned only if the denial constitutes an abuse of the district court's discretion. See Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985); Barrows v. Forest Laboratories, Inc., 742 F.2d 54, 58 (2d Cir.1984). On the other hand, as Foman makes equally and explicitly clear, that discretion must be exercised in terms of a justifying reason or reasons consonant with the liberalizing "spirit of the Federal Rules." See Fed.R.Civ.P. 1 (rules to be construed "to secure the just, speedy, and inexpensive determination of every action").
 
 
 35
 The bankruptcy court conceded that delay, standing alone, is an insufficient basis to deny leave to amend, see, e.g., State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981); Middle Atl. Utils. Co. v. S.M.W. Dev. Corp., 392 F.2d 380, 384 (2d Cir.1968); 6 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1488, at 438 (1971), but concluded that MarAd's tactics resulted in "last minute surprise and inability of opposing counsel to meet the tendered issue" within the meaning of Evans v. Syracuse City School Dist., 704 F.2d 44, 47 (2d Cir.1983) (quoting Nevels v. Ford Motor Co., 439 F.2d 251, 257 (5th Cir.1971)). We disagree.
 
 
 36
 In Evans, defendant endeavored to tender the affirmative defense of res judicata two years and nine months after it became available, after two pretrial conferences had been conducted and only six days before the scheduled trial date. In addition, we concluded that in the special circumstances there presented, allowing the amendment would not only be "prejudicial to plaintiff and her appointed counsel," but would also "seriously disrupt the benefactory plan devised by Congress for Title VII cases." Evans, 704 F.2d at 48.
 
 
 37
 The other cases invoked by the bankruptcy court are similarly distinguishable. In Ansam Assocs., for example, plaintiff sought to amend its complaint after the time for discovery had run to allege "new claims concern[ing] a different period of time and ... derived from a different statute." Id., 760 F.2d at 446. In Barrows, plaintiff sought to amend its complaint two and one-half years after it was originally filed to state new claims which, in our view, "represented a radical shift from the recovery sought in the original complaint," id., 742 F.2d at 58; arguably "created 'an imminent danger that plaintiff would seek to force a favorable settlement by abusive use of the discovery process' " id. (quoting memorandum and order of the district court below); and were in all likelihood without merit, id. at 59-61.
 
 
 38
 The facts here are quite dissimilar. As the prior discussion herein indicates, the question whether MarAd was required to plead its "buyer" defense affirmatively was fairly close, and there were few relevant precedents. We note further that one of the main reasons for the rule stated in Fed.R.Civ.P. 8(c) is to avoid surprise to the plaintiff. See Evans, 704 F.2d at 47; Dixson v. Newsweek, Inc., 562 F.2d 626, 633 (10th Cir.1977); Carr v. National Discount Corp., 172 F.2d 899 (6th Cir.), cert. denied, 338 U.S. 817, 70 S.Ct. 59, 94 L.Ed. 495 (1949); 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1271, at 315 (1969). In view of the pleading of the "buyer" defense as an affirmative defense by MarAd's codefendant Tacoma at the outset of the litigation, and its specific invocation by MarAd in motion papers filed in the related Tacoma bankruptcy proceeding in November, 1986, we discern little legitimate surprise to the Banks when MarAd subsequently sought to amend its answer to assert the "buyer" defense in the adversary proceeding.
 
 
 39
 Nor is there any convincing showing of significant prejudice. The Banks claim that the proposed amendment would lead to vastly increased discovery. MarAd contends that the new issues injected into the case would be primarily legal in nature, requiring little discovery. In any event, the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading. See S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 43 (2d Cir.1979).
 
 
 40
 As Foman makes clear, and as we have determined in the past, see State Teachers Retirement Bd., 654 F.2d at 855-56; S.S. Silberblatt, Inc., 608 F.2d at 42-43; Middle Atl. Utils. Co., 392 F.2d at 384-87, the mandate of Fed.R.Civ.P. 15(a) that leave to amend "shall be freely given when justice so requires" requires reversal of denials of leave to amend where the challenged denial exceeds the bounds of judicial discretion, viewed in terms of the provisions of Rule 15(a) and the policy underlying them. We conclude that the bankruptcy court (and therefore the district court) abused its discretion in denying MarAd's motion to amend its answer to assert the "buyer" defense.
 
 
 41
 The Banks contend, finally, that the rejection of the Construction Contracts by order of the bankruptcy court, pursuant to 11 U.S.C.A. Sec. 365 (West 1979 & Supp.1989), is dispositive of MarAd's proposed "buyer" defense, and that the proposed amendment to assert that defense should accordingly be rejected. See S.S. Silberblatt, Inc., 608 F.2d at 42 (trial court does not abuse discretion by denying leave to amend complaint which as amended would fail to state cause of action); Freeman v. Marine Midland Bank-New York, 494 F.2d 1334, 1338 (2d Cir.1974) (same). This question was not considered below, and we decline to consider it for the first time on appeal without the benefit of the bankruptcy court's expertise concerning it.
 
 Conclusion
 
 42
 The order of the district court is reversed, and the case is remanded to the district court with the instruction to remand to the bankruptcy court with the instruction to grant MarAd's motion for leave to amend its answer to assert the "buyer in the ordinary course of business" defense.
 
 
 
 [1]
 The pleadings and captions below refer to "The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administration" (emphasis added). The caption used by all the parties to this appeal, however, refers to the United States as "representing the Secretary of Transportation, for and on behalf of the Maritime Administration and representing [ASI]" (emphasis added). In any event, we have adopted the latter caption, consistent with the practice of the parties to this appeal, to avoid further confusion. Appellant will be referred to hereinafter as "MarAd". We take this occasion to note also that subsequent to the initiation of this adversary proceeding, Continental assigned its claim against Tacoma to the Federal Deposit Insurance Corporation
 
 
 [2]
 The parties are in apparent agreement that the pertinent provisions of the Uniform Commercial Code are identical in all states whose law could conceivably apply in this case
 
 
 [3]
 Fed.R.Civ.P. 8(c) provides in relevant part:
 In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.
 
 
 [4]
 As hereinafter considered, this rule is modified by the provisions of Fed.R.Civ.P. 15(a) with respect to the amendment of pleadings. See 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1278, at 345 (1969)