Adam REGENBOGEN, Plaintiff,

v.

Anthony N. MUSTILLE, Executive Director, Willard Psychiatric Center, C. Richard Orndoff; Western Regional OMH Director; Richard C. Surles, Commissioner, NYS Office of Mental Health, Defendants.

No. 92–CV–1662 (RSP/GJD).

United States District Court,
N.D. New York.

Dec. 5, 1995.

1102

Ronald P. Hart, Ithaca, NY, for Plaintiff.

Dennis C. Vacco, New York State Attorney General, Albany, NY (Richard J. Freshour, Assistant Attorney General, of counsel), for Defendants.

## MEMORANDUM–DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

Defendants Anthony Mustille, C. Richard Orndoff and Richard C. Surles move for summary judgment dismissing plaintiff Adam Regenbogen's claims of discrimination based on religion and national origin. These claims arise out of Regenbogen's termination from his job as Director of Quality Assurance ("DQA") at Willard Psychiatric Center ("Willard"), a mental hygiene facility within the New York State Office of Mental Hygiene ("OMH"). At the time of Regenbogen's termination, Surles was the commissioner of OMH, Orndoff, the western regional director, and Mustille, the facility director at Willard. Regenbogen, in turn, moves to amend his complaint to add claims that he was denied equal protection and due process, that he was discriminated against on the basis of disability,[1] and that defendants retaliated against him for protesting the layoff of high level female employees in his department.

Regenbogen has alleged consistently since the time of his discharge in the course of a statewide reduction in force ("RIF") that his termination was unwise, illegal and discriminatory; however, his theory of the case has been a moving target. At various times he has alleged that he was discriminated against because he is disabled, because he was born in Austria, because he is Jewish, because he complained about the disproportionate impact of the reduction in force on minorities and because he complained about the disproportionate impact of the layoffs on women. Initially he claimed that he, as a Jew, suffered discrimination along with other minorities, but on these motions, he claims that preferences granted to those other minorities during the layoffs were unconstitutional. Because Regenbogen has demonstrated genuine issues of material fact concerning his claim that his termination was motivated by religion but not concerning any of his other claims, I grant defendants' motion for summary judgment in part and deny it in part. Because the amendments Regenbogen proposes would be futile or would substantially prejudice the defendants, his motion to amend is denied.

### BACKGROUND

#### I. Procedural Background

Regenbogen lost his job on June 26, 1991. On November 5, 1991, Regenbogen filed a charge with the New York State Division of Human Rights ("DHR") and the United States Equal Employment Opportunity Commission ("EEOC"). Regenbogen checked the boxes for discrimination based on race, retaliation, and religion on the charge form. However, he wrote in the body of the form that he believed "that the Respondent eliminated [his] position and discharged [him] because of [his] religion, Jewish." Compl.Ex. at 3. In a longer statement attached to the charge, Regenbogen made certain allegations suggestive of retaliation for complaints he had made about unfairness to minorities. Compl.Ex. at 6 ¶¶ 15–16. Regenbogen did not, however, make any allegations relevant to his claim of race discrimination.

On September 18, 1992, EEOC dismissed Regenbogen's charge.[2] Regenbogen, who is an attorney, then commenced this lawsuit pro se by filing a complaint with the clerk's office on December 23, 1992. On the civil cover

---

1. The request to amend to state a claim for disability based discrimination is implicit rather than explicit. *Compare* Mem.Supp.Mot.Am. at 1 *with* Prop.Am.Compl. ¶ 10(C).

2. The record does not indicate the disposition of the charge Regenbogen filed with DHR.

sheet Regenbogen indicated that his cause of action was "Title VII. Employment discrimination case and/or Title I, Americans with Disabilities Act." Regenbogen indicates in the complaint itself that he believes he was discriminated against on the basis of religion and national origin. He alleges that he is Jewish and that OMH terminated him rather than a less qualified non-Jewish DQA at Elmira Psychiatric Center. Regenbogen also claims that he was discriminated against on the basis of national origin. This claim rests on Regenbogen's allegations that he was born in Austria and that the "other European immigrant" was targeted for layoff in an earlier RIF. Compl. ¶ 8; Compl Ex. at 4 ¶ 5. Regenbogen also complains that other minorities were targeted in the RIF, and that the affirmative action officer was the only remaining African–American in Willard's administration.

After the parties completed discovery, defendants moved for summary judgment. I heard oral argument on February 21, 1995. At oral argument, I granted plaintiff an opportunity to put certain unsworn submissions into sworn form.

On April 19, 1995, I sent the parties a letter noting that Regenbogen had opposed summary judgment on several grounds not specifically identified in the complaint and granting him two weeks to move to amend his complaint. Regenbogen[3] has now moved to amend his complaint to add claims of retaliatory discharge, denial of equal protection and due process, and disability-based discrimination.

## II. Factual Background

Regenbogen's submissions on the issue of discrimination fall into two general categories: allegedly discriminatory actions that affected him directly and allegedly discriminatory actions aimed at others. With respect to the second category, Regenbogen claims that he was either discriminated against for complaining about these actions or that they tend to show that defendants' motive in discharging him was discriminatory.

### A. Plaintiff's Own Experience Prior to the 1991 Reduction in Force

Regenbogen was hired as the DQA (a deputy director level position) for Willard in August 1987.[4] Def. 7.1(f) Statement ¶ 1; Pl. 7.1(f) Statement ¶ 1. He was the only deputy director to be housed outside of the main administration building and believes that his location, in a building called Grandview, gave him less access to the facility director, defendant Mustille. Compl. ¶ 7. Mustille explains that when the main administration building was planned, the quality assurance position was not a deputy director position and therefore no space was allocated to it. Mustille Dep. at 98–102. Both Regenbogen's predecessors and his successor, a Roman Catholic, had offices outside the main administration building. *Id.;* Murphy Dep. at 53; Kwitek Dep. at 9. Regenbogen does not directly controvert Mustille's assertions but argues that by the time the main administration building was opened up in the late 1980's, the quality assurance position had director level status and therefore merited space in the main administration building. Regenbogen Dep. at 46–47. Although conceding that his successor, Richard Kwitek, uses the Grandview office when he is at Willard, Regenbogen notes that Kwitek's primary office is in Elmira where he occupies space close to the director. Pl. Rule 7.1(f) Statement at ¶ 33. Regenbogen does not indicate that he complained to Mustille or anyone else about the location of his office.

Willard administrators told Regenbogen when he was hired that he could rent housing on the Willard campus until he sold his house in Long Island. Regenbogen Dep. at 42–43. When Regenbogen sold his Long Island home in 1989, he asked for an extension of this rental arrangement because he sensed

---

**3.** After Regenbogen, who had thus far acted pro se in this action, submitted his motion to amend, he retained Ronald P. Hart, Esq., as his attorney. Counsel then submitted an additional brief in support of the motion to amend. Defendants have not objected to submission of this brief, and I have considered it on this motion.

**4.** The factual allegations set forth are either agreed to by the parties or come from plaintiff's submissions except as specifically indicated.

"maybe there would be some problems down the line." *Id.* at 44. He now complains that Willard's refusal to allow him to remain in campus housing created economic problems for him when he was terminated. Compl. ¶ 5. Regenbogen also claims that the defendants' policy of discouraging permanent on-campus housing has a negative impact on attracting and retaining Jewish workers because few Jews reside in the immediate area of Willard. Pl.Mem.Opp.S.J. at 6.

Regenbogen also complains that defendants scheduled governing body meetings on Jewish holidays including "the high-holy days between Rosh Hashanah and Yom Kippur and Passover, the eight-day period in Passover." Regenbogen. Dep. at 16. Regenbogen was unable to give a reliable estimate of the number of such meetings but said there "weren't very many" executive cabinet meetings attended by the regional director but other meetings were "frequently" scheduled. *Id.* He estimated that he missed one and perhaps two meetings at which pending layoffs were discussed. *Id.* at 20. Asked whether he had protested the scheduling of these meetings, Regenbogen said that he filled out a slip indicating that he was going to be off and "I'd have my secretary tell his secretary that—for example, I can remember a couple of times saying that, if there was business that was going to be important, certainly to reschedule it." *Id.* at 19. In general he indicates that meetings were held even if he wasn't going to be present. *Id.* at 15

### B. The 1991 Reductions in Force

In both fiscal years 1990/91 and 1991/92, budgetary concerns forced extensive layoffs and terminations in OMH. Def. 7.1(f) Statement ¶ 6; Pl. 7.1(f) statement ¶ 6. In February 1991, Willard reduced its work force by eliminating 101.3 positions. Feligno Aff. ¶ 18. The RIF plan called for Willard to eliminate an additional 39 positions effective June 26, 1991. Def. 7.1(f) Statement ¶ 9.

Bruce Feig, executive deputy commissioner for OMH, issued guidelines for the June 1991 RIF on February 22, 1991. Orndoff Aff. ¶ 10; Dep.Ex. 2. Feig directed the facilities to follow several policies in determining which positions to eliminate. These policies included insuring that administrative and other top level staff shared the burden of cut backs, considering the impact of the decision to eliminate a particular position on other facilities within the layoff unit, and involving affirmative action administrators in plan development to minimize the impact on protected classes. *Id.*

The 1991 RIF's took place against the backdrop of ongoing discussions about consolidating Willard and Elmira Psychiatric Facilities. Orndoff Aff. ¶ 5. Prior to the June 1991 RIF, OMH had eliminated the job of director of community services at Elmira and assigned the functional responsibility for the community services department at Elmira to the director of community services at Willard. Mustille Aff'n ¶ 7. However, no decision had been reached at that point as to which of the two facilities would close. *Id.*

Willard established a task force of administrative personnel including Regenbogen to make recommendations concerning the positions to be eliminated at Willard. Mustille Aff'n ¶ 5. The task force—over Regenbogen's objections—targeted all of the positions in the Quality Assurance Department except Regenbogen's. Regenbogen Aff'n Supp.Mot. Amend ¶¶ 5–6. These positions—all of which were administrative—were held by two white females and a white Catholic male, John Fracchia. *Id.*; Orndoff Dep. at 17. Another female manager, Kristina Stanko, had lost her job in the February 1991 RIF. OMH ultimately did not eliminate Fracchia's job. Feligno Dep. at 12.

The task force made no recommendation concerning Regenbogen's position. According to Orndoff, he and the facility directors at Willard and Elmira decided that the two facilities needed only one quality assurance director and determined to eliminate Regenbogen's position rather than the position of his Roman Catholic counterpart at Elmira because although both had useful experience and had performed their duties satisfactorily, "on balance, Mr. Kwitek's longer length of service, his experience and performance made him the preferred choice." Orndoff Aff. ¶¶ 10–11. Mustille claims little recall of the conversations concerning the DQA posi-

tion but indicates that Orndoff made the decision to terminate Regenbogen. Mustille Aff'n ¶¶ 6, 8.

### C. Impact of the 1991 Layoffs on Jews and Other Minorities

Regenbogen now alleges that the 1991 layoffs had a disproportionately severe impact on Jews and an impact on other minorities that was less severe than would be expected. Regenbogen initially identified four Jewish employees out of a total of five allegedly employed by Willard as adversely impacted by the 1991 layoffs: Regenbogen; Holly Meyerson, a psychiatrist; and Sam Pillar, the chief of medicine, all lost their jobs according to Regenbogen. Aaron Pines, a dentist, was not laid off but after the RIF, Pines was required to care for the patients of two facilities rather than just those at Willard. Compl. ¶ 13(2). In an October 20, 1994, letter to defense counsel, Regenbogen amended the list to include Larry Rivkin, a pharmacist who allegedly resigned in anticipation of layoff, Amy Macey, Jerry Hersh, a consultant, and David Regenspan, a rabbi. Feligno Aff., Ex. A. Defendants submit documentary proof that Meyerson resigned on May 10, 1991, Rivkin resigned on Feb. 13, 1991, Macey resigned in 1988, Pillar resigned in 1992, Hersh was terminated effective June 14, 1989, and Regenspan resigned effective July 30, 1992. Feligno Aff. ¶¶ Ex. B, C, E, G, H and I. Regenbogen counters with an affirmation from Rivkin in which Rivkin alleges that he resigned "to save [his] sanity" and that he had repeatedly heard racial and ethnic slurs in the workplace. Rivkin Aff'n at 2. Regenbogen also alleges that Pillar, prior to his resignation, had been forced out of his position as chief of medicine; however, Regenbogen does not point to any evidence in the record in support of that allegation. Pl. Rule 7.1(f) Statement ¶ 28. Regenbogen does not controvert OMH's account of the terminations of Hersh, Macey, Meyerson or Regenspan.

Regenbogen's claim of a statistical disparity in the 1991 terminations rests on an affirmation from Paul Velleman, Ph.D. Velleman, a statistician, begins with factual assumptions [5] that of the seven Jews employed at Willard at the beginning of 1990, six were no longer employed at the end of 1991 and that of the 883 non-Jews employed at Willard at the beginning of 1990, 151 were no longer employed at the end of 1991. Velleman Aff'n at 2–3. Using these assumptions, Velleman finds that 17.1 percent of the non-Jews were separated from employment while 85.7% of the Jews were separated. Id. at 3. He suggests that the likelihood of this percentage of Jews being selected for separation independent of their Jewishness is less than two in ten thousand. Id. at 2. Velleman next turns, however, to the fact that only one Jew was actually laid off in 1991 and finds no statistically significant effect attributable to that employee's Jewishness. Id. at 3.

Velleman also suggests in a letter [6] that minority employees at level G23 and above were not laid off in proportion to their numbers at those levels. Velleman Ltr. 1/18/95. Velleman assumes that the proportion of minorities at level G23 and above was 21% and that there were 64 people laid off at level G23 and above and then states that one would anticipate that 21% of those laid off or 13.4 employees would be minorities, but that in fact only one minority was laid off. [7] Velleman states that if the layoffs were performed in a manner blind to minority status, the probability of a result this extreme was less than one in a thousand. Id.

### D. Anecdotal Evidence of Insensitivity to Jewish and Other Minority Concerns

Regenbogen urges that his termination took place in the context of a general bias against Jews and of insensitivity to their concerns. Specifically, he alleges that (1) Jewish patients were subjected to trappings of the Christian religion, (2) the Rabbi was a recipient of Christmas cards, (3) the Jewish

---

**5.** Velleman does not identify the source(s) of his factual assumptions.

**6.** Although Regenbogen was given an opportunity to have all of his unsworn submissions resubmitted in proper evidentiary form, he did not obtain a sworn or affirmed version of the Velleman submission on minority terminations.

**7.** These numbers appear to be statewide figures.

cemetery was in terrible condition, (4) the Rabbi was often unable to assemble a minyan, and (5) two Jewish pharmacists were discriminated against on the basis of their religion. Pl.Mem. at 5–6; Rivkin Aff'n; Oliver Aff'n.; Regenspan Aff.; Borts Dep. at 10, 14, 17–18, 23.

Regenbogen claims that Jews were discriminated against along with other minorities and specifically claims that the African-American Director of Pharmacy was the only other high level administrative employee housed in Grandview with Regenbogen rather than in the main administration building. Regenbogen Dep. at 48–49.

### E. Impact of the 1983 RIF on Jews

Regenbogen also seeks to reach back to a 1983 RIF to show discrimination against Jews. He claims that four Jews lost their jobs in 1983. Two, David Birnbach and Michael Shiro, were laid off. Feligno Aff.Ex.A. The remaining two, Robert Hamlish and Morris Goldfarb, retired, but Regenbogen alleges that Hamlish had earlier been fired as deputy clinical director at Elmira. *Id.* Based on his assumptions that only four of the seven Jews who were employed at Willard in grade 18 or above prior to the 1983 RIF were employed there after the 1983 RIF and that 124 of the 135 non-Jews employed at Willard at Grade 18 or above prior to the 1983 RIF remained employed after the RIF, Velleman opines that "the pattern cannot plausibly be considered the result of random selection of those separated." Velleman Aff'n at 1. Even counting only the two Jews who actually lost their jobs as a result of the 1983 RIF, Velleman believes that it is unlikely they were selected for layoff independent of Jewishness. *Id.* at 2.

## DISCUSSION

### I. Motion to Amend

#### A. The General Standard

■ Leave to amend should be granted if the facts or circumstances the plaintiff relies on can be a proper subject for relief and there is no apparent reason such as undue delay, bad faith, dilatory motive, repeated amendments that did not cure the pleading deficiency, undue prejudice or apparent futility of the amendment to deny the request. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In the Second Circuit, delay alone will not prevent an amendment. *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981). A court may, however, premise denial of a request to amend on futility, *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993), *cert. denied* —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994) or substantial prejudice, *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir.1968). To make a determination on prejudice, the court must weigh "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) [in the case of a new affirmative defense in an answer] prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assoc.,* 988 F.2d 344, 350 (2d Cir.1993).

■ In addition to arguing that Regenbogen's proposed amendments do not meet the standards for allowing permissive amendment, defendants also argue that the proposed amendments are barred because Regenbogen did not articulate them in his EEOC complaint. *See* Def. Mem.Opp'n.Mot.Amend at 2. Defendants argue correctly that this court has jurisdiction to hear Title VII claims only if they were included in the EEOC complaint or occurred subsequent to the EEOC complaint and are reasonably related to the charges alleged in the EEOC complaint. *Butts v. City of New York Dep't Hous.,* 990 F.2d 1397, 1401 (2d Cir.1993). However, because the defendants are state employees, Regenbogen may also allege violations of 42 U.S.C. § 1983 with respect to his due process and equal protection claims. *See Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 576 (2d Cir.1989). Section 1983 does not require filing with the EEOC. 42 U.S.C. § 1983. Because plaintiff, although an attorney, was acting pro se at the time he drafted his complaint and amended complaint, I will construe these pleadings liberally and examine the due pro-

cess and equal protection claims as if Regenbogen had pled a violation of section 1983. Title VII's administrative exhaustion requirements do, however, govern Regenbogen's retaliatory discharge claim.

### B. Due Process Claim

Regenbogen seeks to add a claim alleging that he was denied due process by the procedures defendants used in implementing their reduction of force to his complaint. Proposed Am.Compl. ¶¶ 9(A), 10(F). As previously noted, I will assume that Regenbogen intends to allege a deprivation of property without due process under color of state law in violation of 42 U.S.C. § 1983. Regenbogen's proposed amendment has merit only if he alleges a protectable property interest. *Cf. Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) ("requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property"). In order to have a property right in continued employment, a public employee "must have more than a unilateral expectation...." *Id.* at 577, 92 S.Ct. at 2709. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. Possible sources of a property interest include state statute or contract. *Id.* at 578, 92 S.Ct. at 2709–10. Generally, at will government employees have no constitutionally cognizable claims with respect to termination of employment. *Luck v. Mazzone,* 52 F.3d 475, 477 (2d Cir.1995) (citing *Waters v. Churchill,* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). Regenbogen believes N.Y.Civ. Serv.L. § 80–a(1) gave him a right to "bump" other DQA's with less seniority. *See* Pl. 7.1(f) Statement ¶ 34. However, section 80–a(1) restricts bumping rights to employees in the non-competitive class who have tenure protection under N.Y.Civ.Serv.L. § 75(1)(c). N.Y.Civ.Serv.L. § 80–a(1). Section 75(1)(c), in turn, gives tenure protection only to non-competitive positions "other than

a position designated in the rules of the state or municipal civil service commission as confidential or requiring the performance of functions influencing policy." N.Y.Civ. Serv.L. § 75(1)(c). Defendants have stated, without contradiction, that the DQA position is a non-competitive, policy-influencing position with no tenure protection. Orndoff Aff. ¶ 12. Therefore, plaintiff cannot prove a property interest founded in state statute.

Nor has Regenbogen identified a provision in a contract that grants him a property interest in his employment. Regenbogen appears to believe that a memorandum from Bruce Feig, OMH Executive Deputy Commissioner, to OMH regional and facility directors created a property interest by describing procedures to be used in the June 1991 RIF. Proposed Am.Compl. ¶ 12(N); Orndoff Aff.Ex. A. This February 22, 1991, memorandum requires among other things that the decision makers identify the employees "with the least seniority/least retention rights" in targeted job titles, pay attention to the potential impact of the layoffs on other facilities in the layoff unit, and involve affirmative action administrators in the layoff process to minimize the impact on protected classes. Orndoff Aff.Ex. A at 3–4. Regenbogen claims (1) that OMH violated the seniority policy set forth in the layoff policies by not allowing him to bump less senior DQA's in the statewide system; (2) that OMH violated its policy of evaluating the impact of the layoffs on the region when it eliminated Regenbogen's position and (3) that OMH violated its policy of taking into account the impact of the layoffs on the disabled by ignoring his hearing impairment. Proposed Am.Compl. at ¶ 12(N).

A review of the context and content of the February 22, 1991, RIF memorandum demonstrates that it created no property interest. First, plaintiff has never claimed and does not claim in his proposed amended complaint that he had any knowledge of the alleged OMH policies when he began working for OMH. Because the memorandum did not exist when Regenbogen accepted employment, it could not have formed any part of a "mutually explicit understanding" between Regenbogen and OMH. *Perry v. Sinder-*

*mann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (citing *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709); *compare Ezekwo v. NYC Health & Hosp. Corp.,* 940 F.2d 775, 777, 782 (2d Cir.), *cert. denied* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991) (property interest in chief residency position created where there was a consistent policy and practice of awarding chief resident position to third year residents on a rotating basis and brochure made available to prospective residents stated that each resident would serve as chief resident for four months during his or her third year).

Second, the provisions of the memorandum concerning impact on other facilities, seniority, and affirmative action cannot be read to grant Regenbogen a property right in continued employment. With respect to seniority, the policy states: "Once the title lists [of jobs proposed for elimination] are submitted, each facility should immediately begin to identify the employees with the least seniority/least retention rights occupying the targeted titles at the facility." Orndoff Aff.Ex. A at 4. As noted previously, Regenbogen had no seniority or bumping rights; therefore, this policy is entirely unapplicable to him. With respect to facility impact, the policy states: *"[p]articular attention should be paid to the potential impact on other facilities in the layoff unit." Id.* at 3. This language is intended to benefit the facility and not a particular individual whose job may impact on other facilities in the layoff unit. Finally, the affirmative action language of the memorandum requires facility directors to involve their affirmative action directors in plan development so that impact on protected class employees is minimized and notes that the central office affirmative action office would also review the plans for potential adverse impact. Again, this language cannot be interpreted as conferring a right in continued employment on any individual member of a protected class. Therefore Regenbogen's motion to amend to add a due process claim must be denied.

### C. Equal Protection Claim

 Regenbogen suggests that OMH implemented a racially conscious policy by requiring facilities to involve their affirmative action officers in reviewing layoff plans to minimize the impact on protected classes. Regenbogen produces evidence that of the 64 employees laid off by OMH at Grade 23 or above, only 2% (one employee) were racial minorities. Proposed Am.Compl. ¶ 12(M); Pl.Dep.Ex. 20(C). The two percent figure for minorities laid off contrasts with a 21% figure for minorities in the workforce at Grade 23 or above prior to the RIF. *Id.* Regenbogen's statistician estimates that the probability of this result being achieved on a race blind basis is less than one in a thousand. Velleman Ltr. 1/18/95.

Regenbogen does not claim that a minority worker replaced him. Nor does he appear to allege that minorities were favored over Caucasians or Caucasian men generally. Instead, he appears to claim that non-white minorities were favored over white minorities because non-white minorities were accorded preferential status while white minorities, e.g. Jews, were not. *See* Freshour Aff. (6/9/95) Ex. 5., Pl.Mem.Supp.Mot.Lv.Am. at 8. He claims not so much that non-white minorities should not be given extra protection as that Jews should also be given preferred status as a minority group.

 All racial classifications imposed by federal, state or local governments must be strictly scrutinized. *Adarand Constructors, Inc. v. Pena,* — U.S. —, —, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). The government actor must show that the racial classification imposed is "precisely tailored to serve a compelling governmental interest." *Id.* Therefore, to the extent Regenbogen claims that Jews should be given increased protection as minorities, he must meet the heavy burden imposed by *Adarand,* i.e., he must show that extension of whatever preferences he believes are given to non-white minorities to Jews is narrowly tailored to a compelling government interest. He has supplied no proof relevant to this issue.

On the other hand, to the extent Regenbogen claims that OMH's alleged policy discriminates against all persons who are not members of the classes protected by the policy, he seeks to impose the same heavy burden on the defendants on a very slender basis and very late in the litigation. Defen-

dants' affirmative action policy does not, like the policy condemned in *Adarand*, create any presumptions linked to race or ethnicity and it imposes no numerical goals. Instead, it describes certain policy objectives including equal employment opportunity for all, elimination of all unjust exclusionary practices or policies, development of educational and training programs for all employees with "due emphasis" on upgrading protected minorities, swift and judicious resolution of human rights discrimination, guidelines for monitoring delivery of mental health services to minority patients, and the establishment of uniform selection procedures for ensuring a fair selection system for "all applicants/employees." Pl.Dep.Ex. 8. This policy, on its face, is obviously not discriminatory. It appears that Regenbogen also claims, however, that OMH had an informal practice during the 1991 layoffs of protecting non-white minorities over white minorities. He relies on the deposition testimony of Sandy Padilla–Salzman, OMH's affirmative action director, and the affirmative action statistics previously discussed. Pl.Mem.Supp.Mot.Lv.Am. at 4. Padilla–Salzman's testimony, fairly read, states only that affirmative action administrators would contact her when the layoffs presented a "grievous situation" with respect to protected minorities. Padilla–Salzman Dep. at 34. This simple statement is not probative of a discriminatory policy. The statistics on minority terminations at high administrative levels may show that minority employees fared better than non-minority employees at the same level. However, the statistics lack any context that might explain why minorities at those levels fared better.

At the inception of this litigation, Regenbogen argued that non-white minorities were fellow victims in the RIF. In light of that claim, defendants have reasonably not attempted to prove that their affirmative action policies did not favor minorities. If Regenbogen is allowed to amend at this late date, the defendants will have to produce the very complicated and substantial statistical and anecdotal evidence necessary to justify a race-based classification. Defendants would be required to expend enormous additional resources and the trial of this matter would be significantly delayed. This cost and delay constitute prejudice within the meaning of *Block*, 988 F.2d at 350. Therefore the motion to amend to include an equal protection claim should be denied.

*D. The Disability Discrimination Claim*

On the civil cover sheet filed with his complaint, Regenbogen stated that he was bringing the action pursuant to "Title VII. Employment Discrimination Case and/or Title I, Americans With Disabilities Act." The complaint itself contains no allegations pertinent to disability discrimination. However, in his proposed amended complaint ¶¶ 9(A), 10(C), Regenbogen alleges that he was discriminated against based on his handicap, a hearing disability. Because Regenbogen's original complaint contained no facts supporting a claim under the Americans With Disabilities Act, 42 U.S.C.A. § 12101 et seq. ("ADA"), I treat the inclusion of allegations concerning his disability in his proposed amended complaint as a request to amend to state a claim under the ADA. This request must be denied as futile because Regenbogen's discharge took place on June 26, 1991, and the ADA covers only conduct occurring after July 26, 1992, its effective date. 42 U.S.C.A. § 12111, Historical and Statutory Notes; *Bent v. Mount Sinai Medical Ctr.*, 882 F.Supp. 353, 355 (S.D.N.Y.1995); *Powell v. New York*, 869 F.Supp. 106, 112 (N.D.N.Y. 1994).[8]

8. Regenbogen has not requested permission to add a claim under the Rehabilitation Act, 29 U.S.C. § 701 et seq. Nor can a claim under the Rehabilitation Act be inferred from the facts pled in Regenbogen's complaint or amended complaint. In order to make out a prima facie case under the Rehabilitation Act, a plaintiff must allege (1) he is handicapped person within the meaning of the Act, (2) he is otherwise qualified to perform his job; (3) he was discharged because of his handicap; and (4) the employer receives Federal financial assistance. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994), *cert. denied* — U.S. —, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). Plaintiff has not adequately pled two essential elements under the act, i.e. that defendant receives federal financial assistance and that he is handicapped within the meaning of the Act. To be handicapped within the meaning of the act, a person must have an impairment that substantially limits one or more of his major life activities, have a record of

### E. The Retaliation Claim

 In his complaint, Regenbogen alleges that

> ... people who, like me are Jewish, as well as many of those people brought in through affirmative action were selected as the ones to be laid off. With the exception of the Medical Staff which is nearly all foreign, and a few individuals in nursing service, Willard has eliminated almost all minorities. The only minority to my knowledge who remains in the Willard Administration is the Affirmative Action Officer.

> In addition, when I sought to bring this unfairness to the attention of my superiors in OMH, the executive director retaliated and placed a written admonishment into my personnel folder.

Compl. ¶¶ 4, 5. His EEOC complaint contained similar allegations. EEOC Compl. ¶¶ 15, 16. The EEOC complaint also states that Tom Gramley—Willard's Director of Community Services—stated that if plaintiff did not put Kristina Stanko, a foreign-born woman on the list for the February 1991 RIF, Regenbogen would not have a rationale for keeping his own position. Regenbogen took this statement as a threat. EEOC Compl. ¶ 7. Regenbogen does not allege that he refused to put Stanko's name on the list.

In response to defendants' summary judgment motion, Regenbogen argued that he was retaliated against for protesting the underrepresentation of women at Willard and for questioning the layoff policy in a memorandum to OMH. Pl.Mem.Opp'n.S.J. at 10. Regenbogen now seeks to amend his complaint to add a claim that Mustille retaliated against him because he complained about the impact of the layoffs on women. This request must be denied because the proposed amendment would be futile both because it lacks merit and because Regenbogen failed to make this claim before the EEOC.

 In order to make out a *prima facie* case of retaliation under 42 U.S.C.A. § 2000e–3(a), Regenbogen must demonstrate that (1) he engaged in an activity protected by Title VII of which his employer had knowledge; (2) his employer harmed him in terms of his employment; and (3) there was a causal connection between the protected activity and the adverse employment action. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991). Section 2000e–3(a) protects the filing of formal charges as well as "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990) (citations omitted).

Prior to making his submissions on the motion to amend, Regenbogen clearly did not satisfy the first element of the *Johnson* test because he offered no credible proof that he engaged in an activity protected by Title VII of which Willard or OMH had knowledge. Neither Regenbogen's deposition testimony nor his Local Rule 7.1(f) statement contains any direct claim that he protested layoffs on the ground of gender or race.[9] Moreover, although various OMH and Willard administrators acknowledged that Regenbogen had complained of the layoffs, their recollection is that Regenbogen complained that Quality Assurance was too deeply cut. They do not recall any complaints based on the gender or race of employees targeted. *See* Orndoff Dep. at 35, McDonald Dep. at 10, Murphy Dep. at 22, 63. In addition, the memo Regenbogen wrote protesting the extensive impact of the RIF on Quality Assurance mentions neither the race nor the gender of any targeted employee. *See* Pl.Dep.Ex. 18D. The advisory memorandum that plaintiff claims is retaliatory is dated five days after this memo and is directed at Regenbogen's

---

having such an impairment or be regarded as having such an impairment. *Id.;* 29 U.S.C.A. § 706(8)(B). The records offered by plaintiff show only that his hearing has decreased and that he now wears hearing aids in groups. *See* Pl.Dep.Ex. 10 at 1.

9. The 7.1(f) statement—which was affirmed under penalty of perjury—and the deposition testimony along with his complaint and EEOC complaint which have been previously summarized constitute Regenbogen's only sworn or affirmed submissions prior to the motion to amend.

alleged failure to follow the chain of command. Pl.Dep.Ex. 18C. The general claims of retaliation in the complaint cannot stand in the face of Regenbogen's failure to make specific allegations, the defendants' impression that Regenbogen's objections to the RIF were not premised on the race or gender of the affected employees, and the consistency of the memos that Regenbogen wrote with the recollection of the defendants. Indeed even the language of the complaint is ambiguous. Regenbogen states that he protested "unfairness" shortly after he notes that Willard eliminated almost all minorities in the RIF but does not state that he protested on the grounds or race or gender. Compl. ¶ 13(4) and (5).

On this motion, Regenbogen belatedly attempts more specific allegations. He alleges that he told the task force planning the layoffs that if anyone had to be targeted in his department, it should be the only male manager, John Fracchia, and that he warned the taskforce that Willard was targeting only women in the higher paying jobs. Regenbogen Aff'n Supp.Mot.Amend ¶ 5. When the task force, nevertheless, targeted Regenbogen's female managers, Regenbogen claims to have protested to Mustille that his "staff was being targeted despite being women and being nurses." *Id.* at ¶ 6. Thereafter, he drafted the memo, Pl.Dep.Ex. 18(D), that resulted in Mustille admonishing him, Pl. Dep.Ex. C.

█ Even with these additions, Regenbogen's claims lack merit. None of the decision makers for Regenbogen's own termination were present at the task force meeting at which he allegedly complained that Willard was targeting only women in higher paid jobs. Regenbogen Aff'n. ¶ 5. Regenbogen claims later to have complained directly to Mustille that his "staff was being targeted despite being women, and being nurses." *Id.* ¶ 6. However, terminating an employee *despite* the fact that she is a woman does not violate Title VII; it is terminating an employee because of his or her gender that violates Title VII. 42 U.S.C. § 2000e–2(a)(1). After repeated opportunities to state a retaliation claim, Regenbogen has failed, and therefore his motion to amend to add this claim must be denied. *Cf. Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (denial of proposed amendment upheld where plaintiff had full access to discovery and still did not allege significant facts tending to show fraud or complicity).

In addition to the lack of merit of the proposed amendment, this claim was never presented to the EEOC. This court "only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to the EEOC charge." *Butts,* 990 F.2d at 1401 (emphasis added) (internal quotations omitted). Regenbogen did not allege to the EEOC that he had complained of unfairness to women in the layoffs. Moreover, the conduct he now complains of did not occur subsequent to his EEOC charge. Therefore, this court lacks jurisdiction to consider this claim making Regenbogen's proposed amendment futile.

## II. Summary Judgement Motion

### A. The General Standard

Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of facts must be determined with reference to the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As to any issue on which the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2553–54.

"If the movant satisfies the burden of establishing that there is no genuine issue of material fact, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed

issue of material fact exists." *Weg v. Macc-hiarola,* 995 F.2d 15, 18 (2d Cir.1993). In satisfying this burden, the non-moving party " 'may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " Fed. R.Civ.P. 56(e). The opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[M]erely colorable" evidence will not suffice as a basis for opposing summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

In weighing a motion for summary judgment, the court must accept as true the non-moving party's evidence and make "all justifiable inferences" in the non-moving party's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. The evidentiary standard governing proof at trial determines how the court must assess the evidence in deciding whether the summary judgment standard has been met. *Id.* at 254–55, 106 S.Ct. at 2513–14. In an ordinary civil case, such as this one, where plaintiffs must prove their case by a preponderance of the evidence, the determinative standard is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

### B. Religious Discrimination Disparate Treatment Claim

■■■■ To make out a prima facie case of religious discrimination in violation of Title VII, a disparate treatment plaintiff must show "that he or she: (1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) that the discharge occurred in circumstances giving rise to an inference of discrimination." *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). In the context of a reduction in force, the plaintiff may satisfy the fourth element by showing that his duties were not eliminated but were transferred to a co-worker who is not a member of the protected class. *Montana v. First Fed. Sav. & Loan*

*Assoc. of Rochester,* 869 F.2d 100, 105 (2d Cir.1989) (applying Title VII principles to an age discrimination case). The burden of making out a prima facie case is minimal. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

■■■■ Once plaintiff has established a prima facie case, defendant must produce admissible evidence of its reasons for the discharge "which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–255 and n. 8, 101 S.Ct. 1089, 1094–95 and n. 8, 67 L.Ed.2d 207 (1981)). Assuming that defendant meets its burden of production, plaintiff must then establish by the preponderance of the evidence that the challenged employment decision was the result of intentional discrimination. *Id.* at —, 113 S.Ct. at 2749. Plaintiff cannot meet this burden simply by persuading the trier of fact that the employer's proffered reason is false; she must also persuade the trier of fact that the true reason for the action was discrimination. *Id.* However, disbelief of the employer's proffered reason, does *permit* the finder of fact to find discrimination. *Id.* The finder of fact can also believe that the appropriate reason asserted by the employer played some part in the adverse employment determination and still find that an improper discriminatory motive determined the result. *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995).

■■■■ To fulfil his ultimate burden of proving discriminatory motive, Regenbogen may, if he wishes, rely on his prima facie case or may produce additional evidence of pretext and/or discriminatory intent. *Chambers,* 43 F.3d at 38. Because intent is notoriously difficult to prove, the plaintiff may rely on circumstantial evidence. *Id.* at 37. In the summary judgment context, "unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing

a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin,* 46 F.3d at 203 (citing *Chambers,* 43 F.3d at 38). The court must be exceedingly cautious about granting summary judgment to an employer when intent is at issue. *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1224 (2d Cir.1994). At this stage, the court should grant summary judgment "only if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." *Viola v. Philips Medical Sys.,* 42 F.3d 712, 716 (2d Cir.1994). However, if the plaintiff has failed to offer proof that could persuade a rational finder of fact that the employer's justification was false and its true motive discriminatory, the court should grant summary judgment even where the same proof has been found adequate to establish a prima facie case. *Id.* at 716–718.

■ Regenbogen has satisfied the "de minimis" burden of establishing a prima facie case as to his claim of religious discrimination. Defendants concede that Regenbogen has satisfied the first three prongs of the *Rosen* test and dispute only the last. Regenbogen alleges that John Fracchia initially assumed a major portion of his duties. Compl. ¶ 13(5), Answer ¶ 9; Fed.R.Civ.P. 8(b), (d). Fracchia, a Roman Catholic, was originally scheduled for layoff but was later retained. Kwitek Dep. at 9; Feligno Dep. at 12. Defendants concede that when the quality assurance functions at Elmira and Willard were merged after his termination, Richard Kwitek, another Roman Catholic, assumed Regenbogen's former duties. Regenbogen has also offered proof that Mustille, one of the decision makers allegedly involved in his termination, knew that he was Jewish. Mustille Dep. at 8. Although Orndoff, the other decision maker, denied knowing that Regenbogen was Jewish, Regenbogen's assertion that Orndoff would have known Regenbogen was Jewish because he did not attend meetings held on the Jewish High Holy Days creates an issue of fact. *Cf. Rosen,* 928 F.2d at 534 (reasonable trier of fact could find defendant knew plaintiff was Jewish from his surname and the vocal anti-semitism engendered by his presence at the site). This

showing raises an inference of discrimination. *See Montana,* 869 F.2d at 105 (2d Cir.1989). Therefore, plaintiff has satisfied the "de minimis burden" of establishing a prima facie case. *Chambers,* 43 F.3d at 37 (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114–15 (2d Cir.1987)).

■ Regenbogen having established a prima facie case, OMH must satisfy its burden of producing a non-discriminatory reason for the discharge which, if believed, would cause the trier of fact to find that Regenbogen was not discharged for discriminatory reasons. OMH has produced evidence that Regenbogen's job was eliminated as part of one of several reductions in force occurring in the 1980's and early 1990's. Orndoff Aff. ¶¶ 4, 9–10; Orndoff Dep. at 41. OMH has also produced evidence that prior to the June 1991 RIF in which Regenbogen lost his job, OMH had begun plans to consolidate the Willard and Elmira Facilities and that Elmira had already lost the position of director of community services with Willard assuming that function for Elmira. Orndoff Aff. ¶ 5; Mustille Aff'n ¶ 7. OMH regional director C. Richard Orndoff indicates that during the process of identifying jobs to be eliminated during the June 1991 RIF, he and the directors of the Elmira and Willard facilities jointly decided that one DQA was sufficient to meet the quality assurance needs of both facilities based both on reductions in patient census and staff and a changed view of quality assurance that encouraged direct involvement of ward staff in quality assurance rather than large centralized departments. Orndoff Aff. ¶ 10. Orndoff also claims that he made the decision to retain Kwitek over Regenbogen in consultation with the directors of both the Elmira and Willard facilities. *Id.* ¶ 11. Orndoff states that although both incumbents met the minimum qualifications for the position, had performed their duties satisfactorily, and had useful experience, "on balance, ... Kwitek's longer length of service, his experience and performance made him the preferred choice." *Id.* The scenario laid out by Orndoff—with support from other OMH officials—constitutes a genuine business justification which, if believed by the trier of fact, would allow him or her to con-

clude that Regenbogen's discharge is not the result of discrimination.

 Thus I am left, as the court often is in a reduction in force case, with the question of whether Regenbogen has offered sufficient proof to allow a rational trier of fact to find that OMH's reasons for selecting him for layoff were pretextual and discrimination the true reason. *Viola*, 42 F.3d at 716 (because a prima facie case is easily made and employers can easily point to a RIF as the rationale for any single termination, cases often turn on the issue of pretext). I note preliminarily that Regenbogen need not show that the entire RIF was pretextual and he does not attempt to do so. Nor does he need to show that the decision to target the DQA position at either Elmira or Willard was pretextual.[10] Regenbogen need only show that a rational trier of fact could conclude that the decision to select him rather than Kwitek (or any other employee) resulted from religious discrimination.

 Although the question is a close one, I believe Regenbogen has satisfied this burden. His prima facie case along with weaknesses and inconsistencies in the testimony of various OMH officials, and the scarcity of Jews in high administrative positions at Willard would allow a rational trier of fact to conclude that Regenbogen's termination was improperly motivated. I note first that OMH's explanation of the decision to chose Kwitek over Regenbogen lacks specificity. *See* Orndoff Aff. ¶ 11. Orndoff refers in general terms to considerations of performance, experience and seniority. *Id.* With the exception of seniority, these factors are highly subjective. Orndoff offers no reasons underlying the conclusion that Kwitek's experience or performance were better than Regenbogen's. *Id.;* Orndoff Dep. at 57–58. And, although Kwitek concededly had more seniority than Regenbogen, Orndoff also indicates that seniority is not a mandatory factor for consideration. Orndoff Aff. ¶ 12. In addition, although Orndoff claims that he discussed the choice between Kwitek and Regenbogen with the directors of both the

Elmira and Willard facilities, the director of the Willard facility, Anthony Mustille, professes no recollection of almost all the circumstances surrounding the selection of Regenbogen's job to be eliminated and appears to believe that the decision to target Regenbogen's position came from above. Mustille Dep. at 65–68. Although the employer's articulation of sufficiently specific and persuasive reasons for targeting one incumbent rather than another may establish lack of discrimination as a matter of law, these circumstances are not present here. *Compare Viola*, 42 F.3d at 717–718 (affirmance of summary judgment grant to employer who targeted plaintiff for layoff based on prior unsatisfactory performance review to which plaintiff had not objected); *Woroski*, 31 F.3d at 109 (affirming grant of summary judgment to employer that showed in an ADEA case that all employees in same work unit as one plaintiff were in the protected class and had more seniority than that plaintiff and that other plaintiff had less job flexibility than his comparators). In this case, defendants' reasons—apart from seniority—are vague and non-specific, and the defendants did not consider seniority to be a mandatory criterion for retention or termination at Regenbogen's level. Therefore, a reasonable factfinder could, although he or she would not be required to, find that the real reason for Regenbogen's termination was his religion.

Moreover, Regenbogen's allegations gain at least some support from the absence of Jews at high administrative levels at Willard. *Cf. Lopez v. S.B. Thomas Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (fact that plaintiff was the only minority district sales manager in defendant's New York offices contributed to the inference of discrimination).

Because the circumstances surrounding the selection of Regenbogen for termination suffice to create a triable issue of fact on pretext, I need not consider the degree to which Regenbogen's other complaints—e.g. concerning the 1983 RIF and scheduling of meetings—would be admissible during the trial of this matter. I note that many of

---

**10.** Regenbogen does attempt to show that the elimination of the DQA position at Willard was pretextual and that the quality of care at Willard

has suffered as a result of this decision. However, his evidence to date does not go beyond speculation.

these complaints are remote and request the parties to include consideration of evidence issues presented by the complaints in their pre-trial memoranda.

### C. National Origin Disparate Treatment Claim

■ Regenbogen also claims that he was discriminated against on the basis of his national origin; he was born in Austria. However, Regenbogen has not established a prima facie case on national origin discrimination. He establishes that he is a member of a protected class and that he lost his job, but he does not establish that his discharge took place under circumstances creating an inference of discrimination. He has not presented any proof on the national origin of the two employees who at different times assumed his job duties and has not demonstrated other circumstances from which the trier of fact could infer discrimination. His claim that another employee who he believed to be of Eastern European origin was terminated in the February 1991 RIF is too insubstantial to create an inference of discrimination. Regenbogen's national origin discrimination claim must therefore be dismissed.

### D. Disparate Impact Claim

■ Regenbogen alleges that Willard engaged in several employment practices that resulted in a disparate impact on Jews and other minorities at the time of the 1991 RIF. Specifically, he claims (1) that Jewish and other minority director level employees were segregated in Grandview while white Christian directors had offices near the facility director in the main administration building; (2) that Willard's decision to discontinue a previous practice of providing housing for certain employees impacted disproportionately on Jewish employees; and (3) that nepotism and subjective decision making in the layoff process itself caused the layoffs to impact disproportionately on Jews. Pl.Mem. at 3–4, 7–9.

■ Disparate impact cases differ from disparate treatment cases in that the plaintiff need not show the defendant to have been motivated by a discriminatory intent. *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 645–46, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989). Instead, the plaintiff may make a prima facie case by showing that a particular employment practice has had "significant adverse effects" on the protected group. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Although disparate impact plaintiffs classically challenge tests or systems, plaintiffs may also challenge subjective decision making processes under a disparate impact theory. *Id.* at 988, 991, 108 S.Ct. at 2785, 2787. Ordinarily, plaintiffs rely heavily on statistical evidence to make a prima facie disparate impact case. *Id.* at 987, 108 S.Ct. at 2785. However, plaintiffs cannot make a prima facie case by simply showing a statistical "bottom line" adverse impact. Instead, they must demonstrate that specific elements of the defendant's policy caused a significant impact on the protected class. *Wards Cove,* 490 U.S. at 656–657, 109 S.Ct. at 2124–25 (rejecting Court of Appeals use of one set of cumulative comparative statistics as evidence of the disparate impact of each of employer's allegedly discriminatory hiring practices and instructing the courts below to require the plaintiffs to show as part of their prima facie case that specific elements of the hiring process had a significantly disparate impact on nonwhites); *see also Lopez,* 930 F.2d at 159–60 (rejecting appellant's statistical proof of disparate impact—"a box of affirmative action reports" showing "a void of black employees" because they did not show a causal nexus between the challenged practice and the absence of black employees in the work place).

Regenbogen fails to make a prima facie showing of disparate impact because he has failed to provide separate statistical evidence as to the effect of each discriminatory practice he claims *and,* more fundamentally because he fails to show that the 1990–91 RIF had a disproportionate impact on persons of the Jewish faith. Regenbogen's statistical expert concedes that if only layoffs are considered, there is no statistically significant evidence of discrimination against Jews in the 1991 RIF. Velleman Aff'n. at 3. Regenbogen may not combine other forms of separation with the layoff to show a discriminato-

ry impact of the layoff. *Cf. Libront v. Columbus McKinnon Corp.*, 832 F.Supp. 597 (W.D.N.Y.1993) (plaintiffs could not combine separations resulting from employer's voluntary early retirement plan and voluntary enhanced early severance with layoffs to show age discrimination where voluntary enhanced early retirement and voluntary enhanced early severance were assumed to be legal under the ADEA). Because plaintiff cannot show that layoffs were correlated with Jewishness in a statistically significant way, he has not made out a prima facie disparate impact case.[11] *A fortiori*, he has not made a prima facie showing that any of the specific practices he complains of—segregation of minority and Jewish directors, discontinuance of the practice of allowing employees to live on campus, and nepotism and or subjectivity in the layoffs—had a statistically significant impact on layoffs of the protected group. In fact, it appears that Regenbogen does not even claim that the housing policy had an impact on the layoffs. Rather, he claims that it resulted in fewer Jews being attracted to work at Willard. This action, of course, concerns plaintiff's termination, not defects in Willard's hiring policies.

Because Regenbogen has offered no proof relevant to a disparate impact theory of employment discrimination, his disparate impact claims must be dismissed.

## CONCLUSION

Plaintiff's motion to amend his complaint is denied in its entirety. Defendants' motion for summary judgment is granted as to all of plaintiff's claims except his claim of disparate treatment based on religion. Defendants' motion for summary judgment on plaintiff's disparate treatment religious discrimination claim is denied.

IT IS SO ORDERED.

---

**11.** It is not clear from plaintiff's memorandum of law whether he argues that we should consider the statistics concerning the 1983 RIF in determining whether the practices of which he complains had a disparate impact on layoffs of Jews. I believe that they are not relevant because plaintiff has not adduced evidence that Jewish personnel were segregated in 1983 or that Willard had discontinued its policy of providing housing to employees by the time of the 1983 RIF. Nor has he offered any evidence that nepotism or subjective decision making were part of the 1983 RIF.